**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HEALTHY GULF
935 Gravier Street
Suite 700
New Orleans, LA 70112,

FRIENDS OF THE EARTH
1101 15th Street, NW
11th Floor
Washington, DC 20005,

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 710
Tucson, AZ 85702,

OCEANA, INC.
1025 Connecticut Avenue, Suite 200
Washington, DC 20036,

and

SIERRA CLUB
2101 Webster Street
Suite 1300
Oakland, CA 94612,

                    *Plaintiffs*,

        v.

BUREAU OF OCEAN ENERGY MANAGEMENT
1849 C Street NW
Washington, DC 20240,

                    *Defendant*.

Civil Action No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiffs Healthy Gulf, Friends of the Earth, Center for Biological Diversity, Oceana, and Sierra Club (collectively, "Plaintiffs") challenge the Air Quality Control, Reporting, and Compliance final rule ("Final Rule") promulgated by the Bureau of Ocean Energy Management ("the Bureau" or "Defendant") on June 5, 2020. 85 Fed. Reg. 34912 (June 5, 2020). The Final Rule kept in place outdated and ineffective regulations governing air pollution from offshore oil and gas operations that were promulgated in 1980, rejecting significant changes that the Bureau had previously determined were needed to ensure compliance with its statutory mandates under the Outer Continental Shelf Lands Act ("OCSLA"). In doing so, the Bureau violated basic requirements for agency decision-making under the Administrative Procedure Act ("APA"), including by failing to offer a reasoned explanation for provisions in the Final Rule, drawing conclusions that run counter to the evidence before the agency, failing to consider important aspects of air pollution from offshore operations, and acting contrary to OCSLA.

2.      The Gulf of Mexico is the nation's primary source of offshore oil and gas, accounting for about 97 percent of all U.S. production. Oil and gas operations in the Gulf and their supporting infrastructure have already caused grave harm to the Gulf ecosystem and surrounding communities. Air emissions from drilling operations, support vessels, flaring, and venting, as well as the refining, transportation, and combustion of fossil fuels, represent a major source of air pollution in both offshore and onshore areas, including in communities that are already overburdened by industrial emissions and related health impacts. These operations also contribute massive amounts of methane to the atmosphere, which results in both ground level ozone pollution and climate impacts that have harmed the Gulf ecosystem and communities through sea level rise, coastal erosion, and more intense and more frequent storms.

3.      The Bureau has a legal duty to regulate air emissions from offshore oil and gas operations in the Gulf of Mexico and elsewhere. Yet the Bureau continues to follow rules that were adopted in 1980 and have been only minimally updated since that time. These regulations have failed to account for technological advances in air pollution control and industry practices and do not reflect current air quality standards set by the U.S. Environmental Protection Agency ("EPA") under the federal Clean Air Act, with which OCSLA mandates compliance. Recognizing these deficiencies, the Bureau in 2016 proposed a major overhaul of its regulations (the "Proposed Rule"). 81 Fed. Reg. 19718 (Apr. 5, 2016). Among other changes, the Proposed Rule would have (1) addressed all current criteria and precursor pollutants and appropriate time intervals (i.e., short term rather than annual limits); (2) changed how lessees evaluate and model emissions, as well as the locations where impacts are calculated; (3) ensured that the Bureau's standards are updated with any EPA revisions to air quality standards; (4) changed the circumstances when pollution controls are required; and (5) required the consolidation of emissions from multiple facilities. However, the Bureau never finalized these proposed changes prior to the change in presidential administrations in January 2017.

4.      After taking office in 2017, then-President Donald Trump issued a series of Executive Orders that called upon federal agencies to review actions that potentially burden domestic energy production and, if appropriate, to revise or withdraw such actions. Executive Order 13795 specifically identified the 2016 Proposed Rule as one such action. On June 5, 2020, the Bureau scrapped the proposed updates and finalized a rule that essentially leaves its decades-old regulations in place with only minor administrative updates. 85 Fed. Reg. at 34912. In doing so, the Bureau failed to meet the requirements of OCSLA and acted in an arbitrary and capricious manner by failing to provide a reasoned explanation for rejecting changes that the

agency itself had found were needed to comply with its statutory mandates, offered a rationale that lacks merit and is contrary to the record before the agency, and entirely overlooked important aspects of the problem of air pollution from offshore oil and gas operations.

5.      The Final Rule is also inconsistent with the Biden administration's commitments to address environmental justice and climate change. In particular, President Biden has highlighted the need for federal agencies to take action to address environmental justice. In 2021, the President issued Executive Order 13390, which reiterated the policy goal of prioritizing and advancing environmental justice, as well as Executive Order 14008, which states in part that "[a]gencies shall make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities[.]" 86 Fed. Reg. 7619, 7629 (Feb. 1, 2021). In April 2023, the President signed Executive Order 14096, Revitalizing Our Nation's Commitment to Environmental Justice for All, finding that to "fulfill our Nation's promises of justice, liberty, and equality, every person must have clean air to breathe; clean water to drink; safe and healthy foods to eat; and an environment that is healthy, sustainable, climate-resilient, and free from harmful pollution and chemical exposure." 88 Fed. Reg. 25251 (Apr. 26, 2023).

6.      The Biden administration has further recognized that climate change presents an existential threat to the nation and the world, and that bold, immediate actions are needed to achieve emissions reductions and curb the climate emergency facing the planet. Executive Order 14008, Tackling the Climate Crisis at Home and Abroad, emphasizes the significant greenhouse gas ("GHG") emissions that result from oil and gas development and sets out a policy of aligning federal management of public waters with the need to support robust climate action. 86 Fed. Reg.

at 7619. The administration directed agencies to make significant reductions in such emissions;

to build resilience against the impacts of climate change; to address actions that conflict with

these objectives; and to "combat the climate crisis" by implementing a government-wide

approach that reduces climate pollution in every sector of the economy.

7.       The United States has formally committed to climate change targets that require

the nation to rapidly decrease GHG emissions. Under the Paris Agreement, which the United

States rejoined on January 20, 2021, the nation committed to holding the long-term global

average temperature "to well below 2°C above pre-industrial levels and to pursue efforts to limit

the temperature increase to 1.5°C above pre-industrial levels." Under the Agreement, the U.S.

Nationally Determined Contribution is to reduce net GHG emissions by 26–28 percent below

2005 levels by 2025 and by 50–52 percent below 2005 levels by 2030. The Biden Administration

has also pledged to reach a 100 percent carbon pollution-free power sector by 2035 and a net-

zero economy by 2050. While the Biden Administration has taken steps to regulate GHG

emissions from onshore oil and gas sources, it has ignored the significant emissions resulting

from offshore oil and gas development and production.

8.       Therefore, Plaintiffs ask this Court to declare that the Bureau's issuance of the

Final Rule violated the APA and OCSLA, vacate and set aside the Final Rule, and order the

Bureau to issue new air quality regulations that comply with the law.

## JURISDICTION AND VENUE

9.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question), 28 U.S.C. § 1346 (action against the United States), and 5 U.S.C. §§ 702–706 (APA).

10.       Venue is appropriate under 28 U.S.C. § 1391(e)(1) because the Bureau's

headquarters are located in this District, two plaintiffs reside in this District, and a substantial

part of the events and omissions which gave rise to this action occurred in this District.

11.     This Court has authority to grant the requested relief in this case pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

## PARTIES

12.     Plaintiff HEALTHY GULF is a network of community, conservation, environmental, and fishing groups and individuals committed to empowering people to protect and restore the natural resources of the Gulf of Mexico. Healthy Gulf's purpose is to collaborate with and serve communities who love the Gulf of Mexico by providing research, communications, and coalition-building tools needed to reverse the long-pattern of over-exploitation of the Gulf's natural resources. Healthy Gulf has been actively involved in efforts to strengthen oversight of the offshore oil and gas industry and end new oil and gas leasing in this region. Healthy Gulf is headquartered in New Orleans, Louisiana, with offices in Pensacola, Florida and Madison, Mississippi. Healthy Gulf's members live in the five Gulf states of Texas, Louisiana, Mississippi, Alabama, and Florida, and nationwide. For example, a member of Healthy Gulf is a small business owner of a Ship Island excursion company, which offers cruises to Ship Island, offshore from Mississippi, as well as dolphin watching cruises in the Gulf. The business has been in his family for generations. He relies on a healthy environment, clean air, clean waters, and healthy marine life to continue the family business which has already been adversely impacted by oil and gas development activities in the Gulf, as well as resulting climate change. Healthy Gulf brings this action for itself and as representative of its members.

13.     Plaintiff FRIENDS OF THE EARTH ("FoE") is a 501(c)(3) nonprofit, membership-based organization headquartered in Washington, D.C. FoE currently has over 8.7 million activists and over 226,000 members, located across all 50 states and the District of

Columbia. FoE's primary mission is to defend the environment and champion a more healthy and just world by collectively ensuring environmental and social justice, human dignity, and respect for human rights and peoples' rights. FoE and its members are dedicated to fighting to reduce air emissions and domestic reliance on fossil fuels and support a temporary pause on oil and gas leasing on federal public lands and water. Specifically, FoE's Climate & Energy and Oceans & Vessels programs directly engage in administrative and legal advocacy to protect the environment and society from climate change, pollution, and industrialization associated with fossil fuel development and GHG emissions. FoE's members recreate and enjoy the waters and wildlife in the Gulf. For example, a FoE member, who is also a member of Sierra Club, visits the Gulf of Mexico regularly with his family to fish and recreate, and hopes to continue doing so in the future. He enjoys fishing, surfing, viewing the wildlife habitats, and visiting rescued turtles on South Padre Island. His enjoyment depends on a healthy environment and abundant marine wildlife protected from oil and gas impacts. FoE brings this action for itself and as representative of its members.

14.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a nonprofit corporation that maintains offices across the United States and in Baja California Sur, Mexico. The Center advocates for the protection of threatened and endangered species and their habitats through science, policy, and environmental law. The Center's mission also includes protecting air quality, water quality, and public health. The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as marine mammals, corals, and sea turtles are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center

has been actively involved in protecting the Gulf of Mexico from the harmful impacts of offshore oil and gas drilling. The Center has more than 89,000 members, including members who live, work, and recreate throughout the Gulf of Mexico region. These members appreciate and benefit from wildlife in the Gulf of Mexico, such as Rice's whales, sperm whales, loggerhead sea turtles, Kemp's ridley sea turtles, leatherback sea turtles, and corals threatened by noise pollution, vessel traffic, oil spills, air pollution, and climate pollution caused by oil and gas activity. For example, the Center has a member who regularly visits the Gulf of Mexico to enjoy marine wildlife. They go to the Gulf of Mexico to observe whales, sea turtles, and other marine mammals. This member works to advocate for wildlife protections from threats such as oil and gas development, pollution, and habitat destruction. Additionally, the Center's member has a strong interest in conserving sea turtles, regularly visiting Gulf sea turtle habitat and nesting beaches to view and enjoy observing turtles there. The Center brings this action for itself and as representative of its members.

15.    Plaintiff OCEANA, INC. is a nonprofit organization dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law, and public education. Oceana is headquartered in Washington, D.C. with regional offices across the United States. Oceana has over one million members and supporters in the United States, including nearly 150,000 members in Gulf states. Oceana's Climate and Energy Campaign uses science and advocacy to drive policies aimed at stopping climate change, with a focus on preventing offshore oil drilling, preventing seismic airgun blasting, and promoting responsible offshore wind energy. Oceana's staff and members have been engaged in opposing offshore oil drilling and have put significant resources and effort into advocating for permanent protection from offshore oil and gas drilling. Oceana brings this action for itself and as representative of its members.

16.     Plaintiff SIERRA CLUB is a not-for-profit organization dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club is one of the oldest and largest conservation groups in the country, with more than 800,000 members nationally in over 60 chapters in all 50 states, the District of Columbia, and Puerto Rico, including over 38,000 members in its Gulf chapters. Sierra Club members use the public lands and waters throughout the Gulf, including those that would be affected by oil and gas activities, for quiet recreation, aesthetic pursuits, and spiritual renewal. Sierra Club members further observe and enjoy wildlife found in the Gulf that may be harmed by oil and gas activities. Sierra Club brings this action for itself and as representative of its members.

17.     Plaintiffs and Plaintiffs' members and staff live and work in the Gulf of Mexico region and regularly use, enjoy, and benefit from the coastal and marine environments of the Gulf, including areas within and adjacent to the five Gulf states, and plan to continue doing so in the future. Plaintiffs and Plaintiffs' members and staff regularly enjoy and benefit from clean air and a healthy environment when engaging in recreational, aesthetic, commercial, scientific, and environmental activities, including whale watching, bird watching, scientific study, boat touring, underwater diving, fishing, photography, and beach bathing.

18.     The Final Rule directly and irreparably injures these interests by failing to properly regulate air pollution from offshore oil and gas operations in the Gulf of Mexico. For example, the Bureau stated repeatedly that the changes proposed in 2016 were needed to ensure compliance with the national ambient air quality standards ("NAAQS") under the Clean Air Act.

According to its environmental assessment for the Proposed Rule, the proposed changes would "avoid potential adverse environmental impacts by reducing the amount of NAAQS criteria pollutants emitted as a result of [Bureau]-approved activities on the [Outer Continental Shelf ("OCS")]…. By reducing emissions of criteria and precursor pollutants, [the Bureau] would, in certain cases, reduce the contribution of OCS facilities' emissions to nonattainment areas, such as ozone in the Houston metropolitan area, preventing future contribution to NAAQS exceedances."[1] Further, by failing to regulate methane emissions from offshore oil and gas operations, the Final Rule increases global GHG emissions and causes additional climate harm. As a result of the Final Rule, the Bureau is allowing oil and gas development to harm the environment in which Plaintiffs and Plaintiffs' members and staff live, work, and recreate in and have an interest. The interests of Plaintiffs and Plaintiffs' members and staff have been, are being, and will be adversely affected by the Bureau's violations of federal law, as described herein. These harms can be remedied only if the Bureau is forced to comply with the requirements of the APA and OCSLA. If the Bureau were directed to follow the requirements of the APA and OCSLA in promulgating new regulations, BOEM could better control air pollution from offshore oil and gas operations in a manner that would minimize or avoid such impacts in the first place. Plaintiffs have no other adequate remedy at law.

19.     Defendant BUREAU OF OCEAN ENERGY MANAGEMENT is the federal agency within the Department of the Interior to which the Secretary of the Interior has delegated authority under OCSLA to manage oil and gas operations on the Outer Continental Shelf and to issue regulations governing such activities. The Bureau is required to comply with the APA in

---

[1] Bureau, *Environmental Assessment, Oil, Gas, and Sulphur Operations in the Outer Continental Shelf 30 CFR Part 550 – Proposed Subparts A, B, C and J*, Bureau 2016-007, at 10 (Mar. 2016).

issuing any such regulations and is responsible for the acts complained of in this Complaint.

## STATUTORY BACKGROUND

### I.    OUTER CONTINENTAL SHELF LANDS ACT

20.     OCSLA governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf. 43 U.S.C. § 1331 *et seq.* The Outer Continental Shelf extends from the outer boundary of state waters—typically three nautical miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605 (Mar. 14, 1983).

21.     In 1978, Congress amended OCSLA to provide, in part, for the development of resources on the Outer Continental Shelf "subject to environmental safeguards." 43 U.S.C. § 1332(3).

22.     OCSLA charges the Secretary of the Interior with managing oil and gas activities on the Outer Continental Shelf. *Id.* §§ 1334(a), 1344(a). Management of the Outer Continental Shelf "shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf," as well as "the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments." *Id.* § 1344(a)(1).

23.     OCSLA prescribes four, tiered stages for the Secretary to sell and allow development of offshore oil and gas deposits: (1) five-year leasing programs; (2) lease sales; (3) exploration plans; and (4) development and production plans. *Id.* §§ 1337, 1340, 1344, 1351.

24.     OCSLA requires that the Secretary of the Interior "shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions." *Id.* § 1334(a). OCSLA specifically provides that the Secretary "may at any time prescribe and amend such rules and

regulations as he determines to be necessary and proper in order to provide for the prevention of
waste and conservation of the natural resources of the outer Continental Shelf." *Id.*

25.     OCSLA further provides that "[t]he regulations prescribed by the Secretary under
this subsection *shall include, but not be limited to*, provisions … for compliance with the
national ambient air quality standards pursuant to the Clean Air Act (42 U.S.C. 7401 *et seq*.), to
the extent that activities authorized under this subchapter significantly affect the air quality of
any State." 43 U.S.C. § 1334(a)(8) (emphasis added). As discussed below, the Bureau regulates
air pollution from OCS sources in the Gulf of Mexico and the North Slope of Alaska.

## II.    CLEAN AIR ACT

26.     Regulation of air pollution from OCS sources is also subject to several provisions
of the Clean Air Act, under which Congress has divided responsibility between EPA and the
Bureau.

27.     The Clean Air Act establishes a comprehensive program for controlling and
improving the nation's air quality. 42 U.S.C. §§ 7401 *et seq*. Congress enacted the Clean Air Act
"to protect and enhance the quality of the Nation's air resources so as to promote the public
health and welfare and the productive capacity of its population." *Id*. § 7401(b)(l). One "primary
goal" of the statute is "pollution prevention." *Id*. § 7401(c). Congress found the Clean Air Act to
be necessary in part because "the growth in the amount and complexity of air pollution brought
about by urbanization, industrial development, and the increasing use of motor vehicles, has
resulted in mounting dangers to the public health and welfare." *Id*. § 7401(a)(2). The Clean Air
Act is primarily administered by EPA.

28.     Section 328 of the Clean Air Act divides responsibility for regulating air
emissions from OCS areas between EPA and the Bureau. *Id.* § 7627. This section, which was
added by the 1990 amendments to the Act, mandates that EPA set requirements "to control air

pollution from Outer Continental Shelf sources located offshore of the States along the Pacific, Arctic and Atlantic Coasts … to attain and maintain Federal and State ambient air quality standards and to comply with the provisions of part C of subchapter I" (i.e., the prevention of significant deterioration ("PSD") program). *Id*. Section 328 leaves the Bureau with jurisdiction over OCS sources in most of the central and western Gulf (in particular, west of 87.5 degrees longitude), as well as the North Slope Borough of Alaska. *Id*.[2]

29.     For OCS sources regulated by EPA pursuant to Section 328, pollution control requirements depend on whether the source is located within 25 miles of a state's seaward boundary (inner OCS sources) or beyond (outer OCS sources). 42 U.S.C. § 7627; 40 C.F.R. Part 55.[3]  Inner OCS sources are regulated the same as comparable onshore sources which vary by state and air quality status. 42 U.S.C. § 7627(a)(1). Outer OCS sources are subject to several Clean Air Act programs, including the PSD program. *Id*. The emission threshold that generally triggers regulation in both areas is the PSD threshold of 250 tons per year ("tpy") of a regulated pollutant. 40 C.F.R. § 52.21(b). Sources that exceed this level are subject to several provisions, including the requirement to use best available control technology ("BACT") or the even stricter lowest achievable emissions rate ("LAER") in nonattainment areas.

30.     The Clean Air Act authorizes EPA to establish national ambient air quality standards ("NAAQS") for certain widespread air pollutants that endanger public health and welfare, referred to as "criteria pollutants." 42 U.S.C. §§ 7407–7410. The NAAQS cover the six

---

[2] Authority over the north coast of Alaska was transferred from EPA to the Bureau by a provision in the Consolidated Appropriations Act, 2012 (P.L. 112-74) on December 23, 2011.
[3] The legislative history shows that Congress adopted Section 328 after becoming concerned that "construction and operation of OCS facilities emit a significant amount of air pollution which adversely impacts coastal air quality" and that OCS air pollution was "causing or contributing to the violation of Federal and State ambient air quality standards in coastal regions." S. Rep. No. 101-228, at 76–77 (1989).

"criteria" pollutants that have long been known to endanger public health and welfare—ozone, particulate matter, carbon monoxide, lead, sulfur dioxide, and nitrogen dioxide. These standards are regularly updated by EPA. In 2009, EPA determined that GHGs such as methane also endanger public health and welfare. 74 Fed. Reg. 66496 (Dec. 15, 2009). EPA lists oil and gas production, transportation, and storage facilities as source categories that emit methane.[4]

31.    The Clean Air Act directs EPA to designate areas with ambient air concentrations that exceed the NAAQS as "nonattainment" areas. 42 U.S.C. § 7407(d)(1).

32.    Sections 160–169 of the Clean Air Act establish requirements for the prevention of significant deterioration ("PSD") of air quality, which reflects the principle that areas where air quality is better than required by the NAAQS should be protected from significant new pollution. 42 U.S.C. §§ 7470–7479. Section 328 explicitly makes this program applicable to OCS sources. 42 U.S.C. § 7627(a)(1).

III.    **ADMINISTRATIVE PROCEDURE ACT**

33.    The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, governs the procedural requirements for agency decision-making, including the rulemaking process. In promulgating a regulation under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted) ("*State Farm*"). Under the APA, a "reviewing court shall … hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. An agency action

---

[4] *See, e.g.*, Cong. Rsch. Serv., *The Legal Framework for Federal Methane Regulation*, IF12217 (Aug. 7, 2023), https://crsreports.congress.gov/product/pdf/IF/IF12217/3; EPA, *Estimates of Methane Emissions by Segment in the United States*, https://www.epa.gov/natural-gas-star-program/estimates-methane-emissions-segment-united-states (last updated June 18, 2024).

is arbitrary and capricious under the APA where the agency (i) has relied on factors which Congress has not intended it to consider; (ii) entirely failed to consider an important aspect of the problem; (iii) offered an explanation for its decision that runs counter to the evidence before the agency; or (iv) offered an explanation that is so implausible that it could not be ascribed to a difference of view or the product of agency expertise. *State Farm*, 463 U.S. at 43.

34.   The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

### STATEMENT OF FACTS

### I.   AIR POLLUTION FROM OFFSHORE OIL AND GAS OPERATIONS

35.   Oil and gas exploration, development, and production on the Gulf of Mexico OCS is extensive. As of July 1, 2024, there were 2,360 active oil and gas leases across 13 million acres in the Gulf, including approximately 3,200 active oil and gas structures.

36.   Oil and gas leasing, exploration, development, and production, along with their associated operations, involve numerous activities that have significant adverse effects on the Gulf environment. In particular, these activities pose a significant source of air pollution that impacts both offshore and onshore areas. Even though such pollution has been recognized as a serious problem for decades, the Bureau has done little to address the impacts of air emissions from offshore oil and gas emissions within its jurisdiction.

37.   Several counties in coastal Texas and Louisiana are in nonattainment for different pollutants. For example, the Houston-Galveston-Brazoria area counties are in nonattainment for the 8-hour ozone standard, while the St. Bernard Parish area is in nonattainment for the 1-hour sulfur dioxide standard.

38.   According to a Senate Report from the 1990 Amendments to the Clean Air Act, "The construction and operation of OCS facilities emit a significant amount of air pollution

which adversely impacts coastal air quality in the United States. Operational emissions from an OCS platform and associated marine vessels can routinely exceed 500 tons of [nitrogen oxides ("$NO_x$")] and one hundred tons of reactive hydrocarbons annually … while drilling a single exploratory OCS well can cause emissions in excess of 100 tons of [$NO_x$]."[5]

39.     Based on EPA permit documents from Regions 4 (Southeast) and 10 (Pacific Northwest), the Congressional Research Service in 2012 estimated air pollution from OCS oil and gas permits to be in the range of 60–855 tpy for carbon monoxide, 443–2339 tpy for $NO_x$, 6–57 tpy for large particulate matter ("$PM_{10}$"), 1–833 tpy for sulfur dioxide ("$SO_2$"), and 11–96 tpy for volatile organic compounds ("VOCs").[6]

40.     These pollutants can have serious adverse health and environmental impacts. Ozone is a colorless, odorless reactive gas comprised of three oxygen atoms. It is formed by the chemical reaction between $NO_x$ and VOCs in the presence of sunlight. Breathing ozone can trigger a variety of health problems including chest pain, coughing, throat irritation, and congestion. It can reduce lung function and inflame the linings of the lungs. Exposure can also worsen bronchitis, emphysema, and asthma, and may permanently scar lung tissue. Elevated ozone concentrations result in increases in school absenteeism, increases in respiratory hospital emergency department visits among asthmatics and patients with other respiratory diseases, increases in hospitalizations for respiratory illnesses, increases in symptoms associated with adverse health effects, including chest tightness and medication usage, and increases in mortality

---

[5] S. Rep. No. 101-228, at 76–77 (1989); *see* 136 Cong. Rec. H12848-01, H12889, 1990 WL 165511 (Oct. 26, 1990); *see also* Niko M. Fedkin et al., *Satellite $NO_2$ Trends and Hotspots Over Offshore Oil and Gas Operations in the Gulf of Mexico*, 11 Earth and Space Sci. e2023EA003165 (Mar. 15, 2024), https://doi.org/10.1029/2023EA003165.
[6] Cong. Rsch. Serv., *Controlling Air Emissions from Outer Continental Shelf Sources: A Comparison of Two Programs – EPA and DOI*, R42123, at 4 (Nov. 26, 2012), https://crsreports.congress.gov/product/pdf/R/R42123/7.

due to non-accidental, cardio-respiratory deaths.

41.    Nitrogen oxides are a group of highly reactive gases that primarily get into the air from the burning of fossil fuels. Breathing air with high $NO_x$ concentrations can irritate airways in the human respiratory system. Over short periods, such exposures can aggravate respiratory diseases, particularly asthma, leading to respiratory symptoms (such as coughing, wheezing or difficulty breathing), hospital admissions, and visits to emergency rooms. Longer exposures to elevated $NO_x$ concentrations may contribute to the development of asthma and potentially increase susceptibility to respiratory infections. People with asthma, as well as children and the elderly, are at greater risk for health impacts. The nitrate particles that result from $NO_x$ make the air hazy and difficult to see through, and also contribute to nutrient pollution in coastal waters.

42.    Sulfur dioxide is a gas largely resulting from the burning of fossil fuels which can impact both human health and the environment. Short-term exposures to $SO_2$ can harm the human respiratory system and make breathing difficult. People with asthma, particularly children, are sensitive to these effects. $SO_2$ can also harm trees and plants by damaging foliage and decreasing growth, and can contribute to acid rain which can impact sensitive ecosystems. $SO_2$ and other sulfur oxides can react with other compounds in the atmosphere to form fine particles that reduce visibility (forming haze), including in parks and wilderness areas.

43.    Particulate matter consists of microscopic solids or liquid droplets that are so small that they can be inhaled and cause serious health problems. Most particles form in the atmosphere as a result of complex reactions of chemicals such as $SO_2$ or $NO_x$. Particles less than 10 micrometers in diameter can get deep into the lungs and even into the bloodstream. These small particles pose the greatest risk to health and are also the main cause of haze in parts of the United States.

44.     In 2019, the Bureau released a study purporting to evaluate the air quality impacts from the 10 Gulf lease sales proposed in the 2017–2022 5-year plan.[7] That study found that the lease sales would contribute to criteria air pollution in the Gulf, including to pollutants in nonattainment areas in the western and central Gulf. The Bureau also found that this pollution would negatively impact visibility at Breton National Wildlife Refuge ("NWR") off the southeast coast of Louisiana.

45.     In its September 2023 final programmatic environmental impact statement for its 2024–2029 5-year plan, the Bureau found that: "Emissions from new or expanded onshore facilities, offshore facilities, and mobile sources may impact air quality in the onshore areas near the Central [Gulf of Mexico ("GOM")] and Southern California Planning Areas. These emissions are significant because, when added to existing sources, they may impact air quality, including contributing pollutants to onshore nonattainment areas, Class I areas, and other nationally designated protected areas. This degradation of air quality could negatively impact people, plants, and animals. Emissions from oil and gas operations may reduce visibility, including in nearby Class I areas and other nationally designated protected areas."[8]

46.     The Bureau further found that these emissions "are potentially significant for the onshore areas adjacent to the Central GOM Planning Area," such as by causing "elevated [ozone] concentrations along portions of the central Louisiana Coast, and visibility and nitrogen deposition impacts at Breton NWR, a Class I Area."[9]

47.     Offshore oil and gas development not only generates air pollution directly, from

---

[7] Darcy Wilson et al., *Air Quality Modeling in the Gulf of Mexico Region*, Bureau 2019-057 (Aug. 2019).
[8] Bureau, *2024–2029 National Outer Continental Shelf Oil and Gas Leasing Program Final Programmatic Environmental Impact Statement*, Bureau 2023-054, at 176 (Sept. 2023).
[9] *Id.* at 207.

activities such as drilling, support vessels, flaring, and venting, but also indirectly, from refining, transportation, and combustion of fossil fuels. Refineries and petrochemical plants that rely on oil and gas produced in the Gulf are frequently located in and have disproportionate impacts on low-income communities and communities of color.[10]

## II.    METHANE EMISSIONS AND CLIMATE IMPACTS

48.    Offshore oil and gas operations are also a significant source of methane emissions. A 2023 analysis from the Bureau estimated total annual platform emissions of methane in the Gulf of Mexico at 95,833 tons,[11] the equivalent of about 579,000 gasoline powered cars being driven for one year.[12] In a separate analysis, the Bureau estimated the total lifecycle methane emissions from a single regionwide lease sale in the Gulf to be 290,000 metric tons.[13]

49.    In its April 2024 inventory of GHG sources and sinks, EPA estimated that federal offshore oil production in the Gulf resulted in 154,507 metric tons of methane emissions in 2022.[14] EPA notes that production accounts for 97 percent of methane emissions from petroleum systems in the United States, with the predominant sources consisting of pneumatic controllers, offshore oil platforms, equipment leaks, chemical injection pumps, gas engines, produced water,

---

[10] *See, e.g.*, Jill Johnston & Lara Cushing, *Chemical Exposures, Health, and Environmental Justice in Communities Living on the Fenceline of Industry*, 7 Current Env't Health Reps. 48 (2020), https://doi.org/10.1007/s40572-020-00263-8.

[11] Bureau, *Outer Continental Shelf Air Quality System (OCS AQS): Year 2021 Emissions Inventory Quality Assurance/Quality Control (QA/QC) Study*, Bureau 2023-023, at ii (Mar. 2023).

[12] EPA, *Greenhouse Gas Equivalencies Calculator*, https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

[13] Bureau, *Gulf of Mexico OCS Oil and Gas Leasing Greenhouse Gas Emission and Social Cost Analysis*, Bureau 2023-013, at 10 (Feb. 2023).

[14] EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks 1990–2022*, EPA 430-R-24-004, at 3-90 (Apr. 2024), https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2022.

and associated gas flaring.[15] Both the Bureau's and EPA's estimates are not based on real world measurements of methane emissions, but rely on emissions factors and modeling.

50.     However, recent science suggests that these modeled estimates significantly underestimate real world methane emissions from offshore oil and gas operations. Based on direct aircraft measurements of methane plumes over the Gulf, Negron et al. (2023)[16] found that emissions are almost triple what the Bureau estimates. Emissions were particularly high at central hub facilities in shallow waters (often consisting of multiplatform complexes with several functions), which were responsible for at least 50 percent of federal emissions. High emission events at these facilities were frequent and attributed to cold venting, emissions from tanks and other equipment, and poor maintenance.

51.     These findings are consistent with several earlier studies finding high emissions from shallow water facilities in the Gulf. Ayasse et al. (2022)[17] found that these shallow water central hub facilities were supermitters of methane, particularly from equipment such as tanks, satellite wells, pipelines, and vents. The study also found that the persistence and loss rate from these facilities tended to be significantly higher than for typical onshore production. Negron et al. (2020)[18] similarly found high methane emissions from shallow water facilities, and concluded that emissions from Gulf oil and gas operations "are not only underestimated, but also analogous

---

[15] *Id.* at 3-75.

[16] Gorchov Negron et al., *Excess methane emissions from shallow water platforms elevate the carbon intensity of US Gulf of Mexico oil and gas production*, 120 Proceedings of the Nat'l Academy of Sci. e2215275120 (2023), https://doi.org/10.1073/pnas.2215275120.

[17] Alana K. Ayasse et al., *Methane remote sensing and emission quantification of offshore shallow water oil and gas platforms in the Gulf of Mexico*, 17 Env't Rsch. Letters 084039 (2022), https://doi.org/10.1088/1748-9326/ac8566.

[18] Gorchov Negron et al., *Airborne Assessment of Methane Emissions from Offshore Platforms in the U.S. Gulf of Mexico*, 54 Env't Sci. & Tech. 5112, 5118 (2020), https://doi.org/10.1021/acs.est.0c00179.

to the highest emitting onshore basins."

52.     Methane leakage from abandoned and orphaned wells may also be a significant yet unaccounted for source of emissions from OCS operations. For example, at least one report found that orphaned offshore wells "can contribute between 3 thousand to 17 thousand metric tons of methane emissions annually—the carbon dioxide equivalent of approximately 16,000 to 91,500 gas-powered cars driven annually."[19]

53.     In addition to underestimating total methane emissions, the Bureau has improperly discounted the impact of the emissions it has identified by applying a 100-year conversion factor of 25 to calculate the global warming potential ("CO2e") of methane.[20] However, the latest Assessment Report from the Intergovernmental Panel on Climate Change ("IPCC") utilizes a global warming potential for methane of 83 over a 20-year time period, and 30 over a 100-year time period.[21]

54.     Methane emissions themselves play a role in the formation of ground level ozone, a dangerous air pollutant that is harmful to both human health and the environment.[22] Ground level ozone is formed from photochemical reactions involving $NO_x$ and VOCs.[23] Although non-methane VOCs are the dominant contributor to ozone formation in polluted regions, methane is a

[19] Zainab Mirza et al., *Fixing Abandoned Offshore Oil Wells Can Create Jobs and Protect the Ocean*, Ctr. for Am. Progress (Apr. 20, 2022), https://www.americanprogress.org/article/fixing-abandoned-offshore-oil-wells-can-create-jobs-and-protect-the-ocean/.
[20] *See* Bureau, *supra* note 13, at 10.
[21] IPCC, *Climate Change 2021: The Physical Science Basis; Working Group I Contribution to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change*, at 1017, Table 7.15 (2021).
[22] United Nations Environment Programme and Climate and Clean Air Coalition, *Global Methane Assessment: Benefits and Costs of Mitigating Methane Emissions* 11, 69 (2021), https://www.ccacoalition.org/sites/default/files/resources//2021_Global-Methane_Assessment_full_0.pdf ("UNEP Global Methane Assessment").
[23] EPA, *Ground Level Ozone Basics*, https://www.epa.gov/ground-level-ozone-pollution/ground-level-ozone-basics.

primary VOC in the global troposphere and a key contributor to ground level ozone.[24]

55.     The world has warmed substantially over the last 150 years, with remarkable acceleration in recent decades, resulting in changes in surface, atmospheric, and oceanic temperatures, melting glaciers, reduced snow cover, shrinking sea ice, rising sea levels, ocean acidification, and changes in precipitation patterns, among other effects. Human activities, especially emissions of greenhouse gases, are primarily responsible. This warming is expected to continue, and its effects will accelerate and intensify in the form of increased storms, flooding, rising seas, high temperatures, and other severe impacts.

56.     Each day since May 4, 2023, the average surface temperature of the world's oceans has been at record levels. In July 2023, a National Oceanic and Atmospheric Administration water monitoring station in Manatee Bay, Florida recorded an ocean temperature of 101.1°F (38.4°C), one of the hottest temperatures ever recorded. These high ocean temperatures are having significant impacts on global sea life, including the mass bleaching of coral reefs in the Gulf and around the world, and can exacerbate extreme weather events such as hurricanes.

57.     Storms are becoming increasingly severe in the Gulf region in the face of climate change. For example, Hurricane Harvey was a Category 4 storm when it hit the coast of Texas in 2017 and dumped 60.5 inches of rain during the multi-day onslaught, killed at least 63 people, affected millions of others in several states, and caused $125 billion in damage. In 2022, Hurricane Ian became the deadliest storm to strike the southwest coast of Florida since 1935, resulting in at least 148 deaths and $50 billion in damage. Scientists have concluded that climate

---

[24] UNEP Global Methane Assessment, *supra* note 22, at 11; J. Jason West et al., *Global health benefits of mitigating ozone pollution with methane emission controls*, 103 Proceedings of the Nat'l Academies of Sci. 3988 (2006), https://doi.org/10.1073/pnas.0600201103.

change made these hurricanes more powerful and increased their deadly flooding.

58.     These strong storms also frequently cause damage to infrastructure such as oil pipelines and offshore platforms. For example, Hurricane Ivan in 2004 caused a massive seafloor shift that toppled a production platform and resulted in the longest recorded oil spill in U.S. history. Hurricane Ike in 2008 caused 24 spills (18 from platforms and 6 from pipelines) totaling over 5,000 barrels of oil released into the environment.

59.     Sea level rise, flooding, and coastal erosion is an acute threat in the Gulf Region. The Fifth National Climate Assessment found that Texas had the highest total damages ($375 billion) from billion-dollar weather and climate disasters between 1980 and 2022.[25] Communities in Gulf states, such as the tribal community of Isle de Jean Charles in Louisiana, are being relocated because of severe land loss, sea level rise, and coastal flooding.

## III.   THE BUREAU'S REGULATION OF AIR EMISSIONS FROM OFFSHORE OIL AND GAS OPERATIONS

60.     As discussed above, Section 5 of OCSLA provides the Bureau with broad authority to prescribe rules and regulations to carry out the provisions of the statute, including rules "to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf." 43 U.S.C. § 1334(a). These regulations "shall include, *but not be limited to*, provisions … for compliance with the national ambient air quality standards pursuant to the Clean Air Act (42 U.S.C. 7401 *et seq*.), to the extent that activities authorized under this subchapter significantly affect the air quality of any State." *Id*. § 1334(a)(8) (emphasis added). However, the Bureau's current regulatory scheme, which was finalized in 1980 and has remained largely unchanged since that time, does not fulfill this minimum requirement.

---

[25] Allison R. Crimmins et al., *Fifth National Climate Assessment,* U.S. Glob. Change Rsch. Prog. (2023), https://doi.org/10.7930/NCA5.2023.CH1.

61.     In order to receive approval for an exploration or development plan, lessees must provide "[t]ables showing the projected emissions of criteria air pollutants, volatile organic compounds (VOC), and total suspended particulates (TSP)"[26] for the proposed activities. 30 C.F.R. §§ 550.218, 550.249. The projected emissions are estimates based on the type of equipment used. *Id.* §§ 550.218, 550.249.

62.     The Bureau's regulations then rely upon an exemption emissions threshold ("EET"), based on projected emissions and distance from shore to determine if a plan's emissions will have significant impacts on air quality. The EET, which was developed in the 1980s, is as follows: EET = 33.3*D. In this equation, EET equals the exemption emissions threshold (in tons per year), and D equals the distance from shore in miles. *Id.* § 550.303(d). Thus, a source located 50 miles from shore would be exempt from air emissions requirements as long as the projected emissions were below an exemption threshold of 1,665 tpy. This figure is several times higher than EPA's PSD threshold of 250 tpy.

63.     If a source did exceed the EET, it would then conduct air quality modeling (using an approved model) to assess whether its emissions would "significantly" affect onshore air quality. *Id.* § 550.303(e), (f). Further requirements would apply if a significance determination is made depending on whether the impacted onshore location is an attainment or nonattainment area. *Id.* § 550.303(g). There is little opportunity for public input on these determinations.

## IV.   THE 2016 PROPOSED RULE

64.     In April 2016, the Bureau proposed a major overhaul of its regulations to ensure that it was meeting its statutory mandates under OCSLA and to account for technological advances in air pollution control and industry practices. 81 Fed. Reg. at 19718. The Proposed

---

[26] EPA replaced "Total suspended particle" with $PM_{10}$ in 1987, but it remains in the Bureau's regulations today.

Rule would have made several significant changes, including: (1) addressing all current criteria and precursor pollutants (i.e., pollutants that lead to criteria pollution, such as ammonia, a precursor of $PM_{2.5}$) and appropriate time intervals (i.e., short term rather than simply annual limits); (2) changing how lessees evaluate and model emissions, including eventual changes to the EETs, as well as the locations where impacts are calculated; (3) ensuring that its standards and emissions thresholds are updated with any EPA revisions to air quality standards; (4) changing the circumstances when pollution controls are required; and (5) requiring the consolidation of emissions from multiple facilities to determine whether combined emissions could jointly cause or contribute to a violation of the NAAQS. *Id*. at 19718, 19720.

65.     In the Proposed Rule, the Bureau stated several times that these changes were necessary to fulfill its responsibilities under OCSLA Section 5(a)(8) and to ensure ongoing compliance with the NAAQS. *Id*. at 19718, 19720, 19721. As the Bureau noted, since the original regulations were promulgated in 1980, several changes had been made to the NAAQS—including the specific pollutants regulated and exposure times—which its regulations failed to match. *Id*. at 19721, 19723. Nor are the 1980 regulations consistent with how EPA regulates other areas of the OCS under the Clean Air Act, such as by treating offshore areas within 25 miles of a state boundary as if the sources were located onshore. *Id*. at 19722.

66.     With regard to GHGs, including methane, the Bureau stated that "because GHGs are not regulated under the NAAQS, Section 5(a)(8) of OSCLA specifically is not the appropriate statutory vehicle to address the harm that GHGs cause and [the Bureau] is not proposing to address the issue of GHG emissions in this proposed rule." *Id*. at 19723. However, after noting that GHG reporting was still required for other purposes, the Bureau stated that "[i]n the coming months, [the Bureau] will engage stakeholders regarding potential avenues to address

GHG emissions, as appropriate, either through a separate rulemaking or some other action." *Id.*
at 19724.

67.     Plaintiffs submitted comments on the Proposed Rule which supported the
Bureau's effort to update and strengthen the regulations, but also recognized that the proposal
falls well short of what the Bureau is authorized to do under OCSLA. In particular, the
comments noted that the Bureau has broad authority to promulgate rules "for the prevention of
waste and conservation of the natural resources of the [OCS]" and that ensuring compliance with
the NAAQS was simply the minimum of what the Bureau should be trying to achieve. *See* 43
U.S.C. § 1334(a). The comments also noted that EPA had begun regulating GHGs, including
methane, under the Clean Air Act, and urged the Bureau to require lessees to assess such
emissions and implement control technologies when appropriate. The comments further took
issue with the Bureau's exclusive focus on onshore air quality, its failure to consider emissions
from support vessels and aircraft, and its continued use of exemption formulas rather than EPA's
threshold for determining significance and requiring pollution controls.

## V.     THE 2020 FINAL RULE

68.     The Bureau never finalized the 2016 Proposed Rule prior to the change in
presidential administrations. In early 2017, President Trump issued several executive orders that
called on federal agencies to review agency actions that potentially burden domestic energy
production and, if appropriate, revise or withdraw such actions. These included Executive Orders
13771 (Reducing Regulation and Controlling Regulatory Costs), 13783 (Promoting Energy
Independence and Economic Growth), and 13795 (Implementing an America-First Offshore
Energy Strategy). Executive Order 13795 specifically identified the Bureau's proposed rule as
one such opportunity.

69.     On June 5, 2020, the Bureau scrapped the proposed updates and finalized a rule

that essentially left its 1980 air quality regulations in place, with only minor administrative updates. 85 Fed. Reg. at 34912. In rejecting the changes in the Proposed Rule, the Bureau claimed that its authority under OCSLA was "much narrower" and "more limited" than EPA's authority under the Clean Air Act. *Id.* at 34913, 34919, 34921. The rule also rejected calls to include GHGs in these regulations, stating that the Bureau's "ability to regulate air quality is limited to the authority provided to the Secretary in section 5(a)(8) … [which] is limited to ensure compliance with the NAAQS, and therefore that provision does not grant authority to regulate emissions that have no relation to attaining a NAAQS." *Id.* at 34919.

70.     However, the Bureau's repeated insistence that it is severely limited in what it can regulate under OCSLA is also not in accordance with law, given that the statute provides ample authority for air quality regulation and OCSLA's legislative history provides that the Bureau "shall be guided by the Clean Air Act, in consultation with [EPA], in promulgating" such regulations. *See* H.R. Conf. Rep. No. 95-1474, at 86 (1978). Moreover, as evidenced by the Bureau's own studies, the outdated regulations left in place by the Final Rule fail to ensure that OCS operations do not cause or contribute to violations of the NAAQS.

71.     Another primary rationale offered by the Bureau for rejecting the proposed changes was that such requirements would unduly burden domestic energy production, contrary to Executive Orders 13771, 13783, and 13795. *See* 85 Fed. Reg. at 34913, 34916, 34935. However, such alleged regulatory burdens are not a factor Congress intended the Bureau to consider when regulating air pollution under OCSLA. Even if these "regulatory burdens" were a factor to consider, the Bureau had calculated the rule's compliance costs in the Regulatory Impact Analysis for the Proposed Rule and concluded that it did "not expect that the proposed

regulatory changes will be unduly burdensome to industry."[27]

72.     The Bureau failed to provide a reasoned explanation for retaining regulations that it admits "have been fundamentally the same since their publication in 1980," 85 Fed. Reg. at 34915, and which it had proposed updating to ensure compliance with OCSLA. For example, the Bureau failed to provide such an explanation for: (1) keeping emissions thresholds and significance levels that result in the vast majority of sources going unregulated; (2) keeping an emissions threshold for total suspended particles, which has not been an EPA-regulated pollutant since the 1980s, and failing to establish thresholds instead for $PM_{10}$ and $PM_{2.5}$; (3) retaining only annual thresholds, rather than setting hourly thresholds for pollutants like $NO_2$ and $SO_2$ to comply with the NAAQS; (4) failing to consider air quality to the states' seaward boundaries, rather than simply onshore, given the significant time residents spend on the water; and (5) deciding that it is unable to regulate methane pursuant to Section 5(a)(8), despite the fact that its rulemaking authority is far broader than ensuring compliance with the NAAQS.

73.     The Bureau's Final Rule is also contrary to evidence in the record. For example, the Proposed Rule and public comments contain significant factual findings supporting the need to regulate air pollution from support vessels and aircraft, which the Bureau failed to address in the Final Rule. The Bureau also provided no evidence to support its claim that the proposed changes would prevent it from complying with statutory timeframes for reviewing exploration or development plans. To the contrary, the Bureau found in the Regulatory Impact Analysis for the Proposed Rule that "[t]he proposed requirements are intended to improve BOEM's review and approval of planned operations by requiring more accurate information and better assessments of

---

[27] Bureau, *Air Quality Control, Reporting, and Compliance Initial Regulatory Impact Analysis, Notice of Proposed Rulemaking (30 CFR Part 550: Subparts A, B, C & J)*, RIN 1010-AD82, at 58 (Mar. 3, 2016).

the air quality impacts from OCS oil and gas operations."[28]

74.     Finally, the Bureau's Final Rule fails to consider important aspects of the problem of air pollution from offshore drilling, such as the contribution of such emissions to nonattainment areas and environmental justice communities. While the Bureau acknowledged that OCSLA's legislative history "demonstrates congressional focus on the health effects on the onshore population," 85 Fed. Reg. at 34928, it ignored the fact that the onshore population spends time on Gulf waters and can also suffer impacts when not onshore.

## CLAIMS FOR RELIEF

### First Cause of Action

**(Violation of the APA and OCSLA: Not in Accordance with the Law;
5 U.S.C § 706, 43 U.S.C. § 1334)**

75.     The allegations made in paragraphs 1–74 are realleged and incorporated by this reference.

76.     OCSLA requires that the Secretary of the Interior "shall prescribe such rules and regulations as may be necessary to carry out" the provisions of the statute, and "may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf." 43 U.S.C. § 1334(a). OCSLA further provides that these regulations "shall include, but not be limited to, provisions … for compliance with the national ambient air quality standards pursuant to the Clean Air Act (42 U.S.C. 7401 *et seq*.), to the extent that activities authorized under this subchapter significantly affect the air quality of any State." *Id*. § 1334(a)(8).

---

[28] Bureau, *supra* note 27, at 58–59.

77.     In reviewing an agency regulation, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

78.     Here, the Bureau's repeated insistence that it is severely limited in what it can regulate under OCSLA is not in accordance with law. In particular, OCSLA provides that the Bureau's regulations shall include, "but not be limited to," ensuring compliance with the NAAQS. 43 U.S.C. § 1334(a). OCSLA further provides broad authority for the regulation of waste prevention and conservation of natural resources. *Id*. OCSLA's legislative history further provides that the Bureau "shall be guided by the Clean Air Act, in consultation with [EPA], in promulgating" such regulations. *See* H.R. Conf. Rep. No. 95-1474, at 86 (1978).

79.     Moreover, as evidenced by the Bureau's own air quality studies, the Final Rule fails to ensure that OCS oil and gas operations do not cause or contribute to violations of the NAAQS.

80.     Accordingly, the Bureau acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of OCSLA and the APA, 5 U.S.C. §§ 701–706.

81.     These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

## Second Cause of Action

### (Violation of the APA: Reliance on Improper Factors;
### 5 U.S.C. § 706)

82.     The allegations made in paragraphs 1–81 are realleged and incorporated by this reference.

83.     In promulgating a regulation under the APA, "the agency must examine the

relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). An agency action is arbitrary and capricious under the APA where the agency has relied on factors which Congress has not intended it to consider. *Id.*

84.     Here, one of the primary rationales offered by the Bureau for rejecting the much-needed updates in the Proposed Rule is that such requirements would unduly burden industry, contrary to Executive Orders 13771, 13783, and 13795. *See* 85 Fed. Reg. at 34913, 34916, 34935. However, such burdens as described in these Executive Orders are not a factor Congress intended the Bureau to consider when regulating air quality under OCSLA. *See* 43 U.S.C. § 1334(a).

85.     Accordingly, the Bureau acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. §§ 701–706.

86.     These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

## **Third Cause of Action**

### **(Violation of the APA: Failure to Provide a Reasoned Explanation; 5 U.S.C. § 706)**

87.     The allegations made in paragraphs 1–86 are realleged and incorporated by this reference.

88.     In promulgating a regulation under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). When an agency "has failed to provide a reasoned explanation, or where the record

belies the agency's conclusion, [the court] must undo its action." *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (citation omitted).

89.     Here, the Bureau failed to provide a reasoned explanation for rejecting changes which it had earlier proposed to ensure compliance with OCSLA. For example, the Bureau failed to provide such an explanation for: (1) keeping emissions thresholds and significance levels that result in the vast majority of sources going unregulated; (2) keeping an emissions threshold for total suspended particles, which has not been an EPA-regulated pollutant since the 1980s, and failing to establish thresholds instead for $PM_{10}$ and $PM_{2.5}$; (3) retaining only annual thresholds, rather than setting hourly thresholds for pollutants like $NO_2$ and $SO_2$ to comply with the NAAQS; and (4) failing to consider air quality to the states' seaward boundaries, rather than simply onshore, given the significant time residents spend on the water.

90.     Further, the Bureau failed to provide support for its conclusory assertions about regulatory burdens on industry, which does not provide the reasoned analysis required by the APA. This rationale is also contrary to the Bureau's prior conclusions in the Regulatory Impact Analysis for the Proposed Rule.

91.     Finally, the record also does not support the Bureau's claim that the proposed changes would have prevented it from complying with statutory timeframes for reviewing exploration or development plans, or that it is precluded from considering air pollution over submerged lands.

92.     Accordingly, the Bureau acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. §§ 701–706.

93.     These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at

law.

## Fourth Cause of Action

**(Violation of the APA: Failure to Consider Important Aspects of the Problem of Air Pollution from Offshore Oil and Gas Operations; 5 U.S.C. § 706)**

94.     The allegations made in paragraphs 1–93 are realleged and incorporated by this reference.

95.     In promulgating a regulation under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). An agency action is arbitrary and capricious under the APA where the agency has entirely failed to consider an important aspect of the problem. *Id*.

96.     Here, the Bureau's Final Rule failed to consider important aspects of the problem of air pollution from offshore drilling, such as the impacts of such emissions on nonattainment areas, or the impacts to individuals engaged in recreational activities on Gulf waters.

97.     The Bureau made no effort to evaluate the significant impacts that air pollution from offshore oil and gas operations has on Gulf communities already overburdened with pollution related to these industries and failed to consider the climate impacts from methane emissions, including the effects of sea level rise, flooding, and increased storms.

98.     Further, the Proposed Rule and public comments contain significant factual findings supporting the need to regulate air pollution from support vessels and aircraft, which the Bureau failed to address in the Final Rule.

99.     Accordingly, the Bureau acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. §§ 701–

706.

100.     These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Issue a declaratory judgment that the Bureau acted arbitrarily, capriciously, contrary to law, and abused its discretion in its promulgation of the Final Rule, in violation of the APA and OCSLA;

2.     Issue an order to set aside and vacate the Bureau's unlawful issuance of the Final Rule;

3.     Issue an order requiring the Bureau to promulgate a new rule that fulfills the legal requirements of the APA and OSCLA;

4.     Award Plaintiffs their costs, reasonable attorneys' fees, and other expenses pursuant to 28 U.S.C. § 2412; and

5.     Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 24th day of July, 2024.

 */s/ Stephen D. Mashuda*
Stephen D. Mashuda (DC Bar No. WA0005)
EARTHJUSTICE
705 Second Ave., Suite 203
Seattle, WA 98104
206-343-7340 Telephone
206-343-1526 Fax
smashuda@earthjustice.org

George Torgun (*pro hac vice* forthcoming)
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111

415-217-2000 Telephone
415-217-2040 Fax
gtorgun@earthjustice.org

Rumela Roy (*pro hac vice* forthcoming)
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
303-996-9623 Telephone
720-550-5757 Fax
rroy@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf, Friends of the Earth, Center for Biological Diversity, Oceana, and Sierra Club*