# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

HEALTHY GULF, et al.,

                              *Plaintiffs*,

     v.

BUREAU OF OCEAN ENERGY
MANAGEMENT,

                           *Defendant*,

     and

AMERICAN PETROLEUM INSTITUTE,

                    *Intervenor-Defendant.*

Case No. 1:24-cv-02175-TNM

# PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ................................................................................................................1

STATUTORY BACKGROUND................................................................................................2

    I.      Outer Continental Shelf Lands Act..........................................................................2

    II.     Clean Air Act .............................................................................................................3

    III.    Administrative Procedure Act....................................................................................6

FACTUAL AND PROCEDURAL BACKGROUND....................................................................7

    I.      Air Pollution from Oil and Gas Operations on the Gulf of Mexico OCS...............7

    II.     The Bureau's Regulation of Air Pollution from Offshore Oil and Gas
          Operations. ................................................................................................................9

    III.    The 2016 Proposed Rule. ........................................................................................11

    IV.    The 2020 Final Rule..................................................................................................15

STANDING ........................................................................................................................16

    I.      Plaintiffs Have Demonstrated Concrete, Actual Injuries Resulting from the
          Final Rule..................................................................................................................16

    II.     Plaintiffs' Injuries Are Fairly Traceable to the Bureau's Adoption of the
          Final Rule..................................................................................................................18

    III.    Plaintiffs' Injuries Will Be Redressed by a Favorable Decision Requiring
          the Bureau to Comply with OCSLA and the APA in Promulgating a New
          Rule. ........................................................................................................................20

STANDARD OF REVIEW .....................................................................................................21

ARGUMENT......................................................................................................................22

    I.      The Final Rule Is Arbitrary and Not in Accordance with OCSLA.......................23

    II.     The Bureau's Reliance on Executive Orders to Justify the Final Rule Was
          Improper....................................................................................................................27

    III.    The Bureau Failed to Provide a Reasoned Explanation for the Final Rule. ..........30

IV.     The Bureau Failed to Consider Important Aspects of the Problem of
        Offshore Oil and Gas Pollution...............................................................................35

REMEDY.............................................................................................................................................39

CONCLUSION...................................................................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*In re Aiken County,*
  725 F.3d 255 (D.C. Cir. 2013) .................................................................................28

*Air All. Houston v. EPA,*
  906 F.3d 1049 (D.C. Cir. 2018) ..............................................................................22

*Allied Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ................................................................................40

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) .........................................................................39, 40

*Amerijet Int'l v. Pistole,*
  753 F.3d 1343 (D.C. Cir. 2014) ..............................................................................29

*Ass'n of Battery Recyclers, Inc. v. EPA,*
  716 F.3d 667 (D.C. Cir. 2013) ................................................................................18

*Becerra v. Dep't of the Interior,*
  381 F.Supp.3d 1153 (N.D. Cal. 2019) ....................................................................28

*California v. Bernhardt,*
  472 F.Supp.3d 573 (N.D. Cal. 2020) .................................................................28, 29

*California v. Bureau of Land Mgmt.,*
  286 F.Supp.3d 1054 (N.D. Cal. 2018) ....................................................................29

*California v. Kleppe,*
  604 F.2d 1187 (9th Cir. 1979) ................................................................................24

*Carpenters Indus. Council v. Zinke,*
  854 F.3d 1 (D.C. Cir. 2017) ....................................................................................20

*Chamber of Commerce of U.S. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ................................................................................28

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) .................................................................................................40

*Clean Wis. v. EPA,*
  964 F.3d 1145 (D.C. Cir. 2020) ..............................................................................18

*Cnty. of Los Angeles v. Shalala,*
  192 F.3d 1005 (D.C. Cir. 1999) ..............................................................................30

*\* Authorities upon which we chiefly rely are marked with an asterisk*

*Ctr. for Biological Diversity v. Dep't of the Interior*,
    563 F.3d 466 (D.C. Cir. 2009) ...............................................................................19

*Ctr. for Biological Diversity v. EPA*,
    861 F.3d 174 (D.C. Cir. 2017) ...............................................................................20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ............................................................................................35, 40

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,
    707 F.3d 462 (4th Cir. 2013) ..................................................................................33

*Edwards' Lessee v. Darby*,
    25 U.S. 206 (1827) ..................................................................................................25

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ................................................................................................30

*Env't Health Tr. v. F.C.C.*,
    9 F.4th 893 (D.C. Cir. 2021) ...................................................................................39

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ..........................................................................................22, 30

*F.C.C. v. Nextwave Pers. Commc'ns Inc.*,
    537 U.S. 293 (2003) ................................................................................................40

*FEC v. Rose*,
    806 F.2d 1081 (D.C. Cir. 1986) ..............................................................................35

*Florida Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) .................................................................................20

*Fred Meyer Stores, Inc. v. NLRB*,
    865 F.3d 630 (D.C. Cir. 2017) ...............................................................................31

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ..........................................................................................16, 20

*Fund for Animals v. Babbitt*,
    903 F.Supp. 96 (D.D.C. 1995) ...............................................................................21

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
    805 F.2d 1050 (D.C. Cir. 1986) ..............................................................................36

*Humane Soc'y of U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ................................................................................31

*Ill. Pub. Telecomms. Ass'n v. F.C.C.*,
    123 F.3d 693 (D.C. Cir. 1997) ....................................................................40

*Int'l Dark-Sky Ass'n v. Fed. Commc'ns Comm'n*,
    106 F.4th 1206 (D.C. Cir. 2024) ..................................................................18

*Larson v. Valente*,
    456 U.S. 228 (1982) .....................................................................................20

*Lewis v. Sec'y of Navy*,
    195 F.Supp.3d 277 (D.D.C. 2016) ...............................................................21

*Loper Bright Enterp. v. Raimondo*,
    603 U.S. 369 (2024) ...............................................................................22, 25

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .....................................................................................18

*Marks v. Cent. Intelligence Agency*,
    590 F.2d 997 (D.C. Cir. 1978) ....................................................................28

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins.*,
    463 U.S. 29 (1983) ............................................................................. *passim*

*Nat. Res. Def. Council, Inc. v. Daley*,
    209 F.3d 747 (D.C. Cir. 2000) ....................................................................21

*Nat. Res. Def. Council v. EPA*,
    755 F.3d 1010 (D.C. Cir. 2014) ..................................................................18

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
    -- F.Supp.3d --, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ........................28

*New York v. Trump*,
    -- F.Supp.3d --, 2025 WL 715621 (D. R.I. Mar. 6, 2025) ..........................28

*Organized Vill. of Kake v. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) .......................................................................30

*Petroleum Commc'ns, Inc. v. F.C.C.*,
    22 F.3d 1164 (D.C. Cir. 1994) ....................................................................40

*PFLAG, Inc. v. Trump*,
    -- F.Supp.3d --, 2025 WL 685124 (D. Md. Mar. 4, 2025)..........................28

*Sierra Club, Lone Star Ch. v. Cedar Point Oil Co.*,
    73 F.3d 546 (5th Cir. 1996) .........................................................................19

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) ..................................................................21

*Sierra Club v. EPA*,
  926 F.3d 844 (D.C. Cir. 2019) ..................................................................18

*Sierra Club v. FERC*,
  827 F.3d 36 (D.C. Cir. 2016) ....................................................................21

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ..................................................................................17

*U.S. Sugar Corp. v. EPA*,
  113 F.4th 984 (D.C. Cir. 2024) ...........................................................22, 26

*United States v. Philip Morris USA, Inc.*,
  396 F.3d 1190 (D.C. Cir. 2005) ................................................................24

*WildEarth Guardians v. EPA*,
  830 F.3d 529 (D.C. Cir. 2016) ..................................................................19

*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) ..................................................................20

**Statutes**

5 U.S.C. § 702 .....................................................................................................7

*5 U.S.C. § 706 ...................................................................................6, 21, 23, 39

42 U.S.C. § 7401 .................................................................................................3

42 U.S.C. § 7407 ..............................................................................................3, 4

42 U.S.C. § 7408 ..............................................................................................3, 4

42 U.S.C. § 7409 ..............................................................................................3, 4

42 U.S.C. § 7410 .................................................................................................3

42 U.S.C. § 7470 .................................................................................................4

42 U.S.C. § 7471 .................................................................................................4

42 U.S.C. § 7472 .................................................................................................4

42 U.S.C. § 7473 .................................................................................................4

42 U.S.C. § 7474 .................................................................................................4

42 U.S.C. § 7475 ..................................................................................................4, 11

42 U.S.C. § 7476 .........................................................................................................4

42 U.S.C. § 7477 .........................................................................................................4

42 U.S.C. § 7478 .........................................................................................................4

42 U.S.C. § 7479 ..................................................................................................4, 11

42 U.S.C. § 7627 ............................................................................................4, 5, 38

43 U.S.C. § 1301 .........................................................................................................2

43 U.S.C. § 1331 .........................................................................................................2

43 U.S.C. § 1332 .........................................................................................................2

*43 U.S.C. § 1334 ...............................................................................................*passim*

43 U.S.C. § 1337 .........................................................................................................2

43 U.S.C. § 1344 ......................................................................................2, 24, 35

43 U.S.C. § 1346 .......................................................................................................37

Pub. L. No. 112-74, 125 Stat. 786 (2012) ..............................................................5

**Regulations**

30 C.F.R. Part 550 ....................................................................................................10

30 C.F.R. § 550.218 .................................................................................................10

30 C.F.R. § 550.249 .................................................................................................10

30 C.F.R. § 550.303 ...................................................................................10, 11, 15

40 C.F.R. Part 50 .......................................................................................................4

40 C.F.R. Part 55 .......................................................................................................5

40 C.F.R. § 50.11 .....................................................................................................34

40 C.F.R. § 50.17 .....................................................................................................34

40 C.F.R. § 51.165 ..............................................................................................5, 11

40 C.F.R. § 52.21 .......................................................................................................5

**Federal Register**

45 Fed. Reg. 15128 (Mar. 7, 1980) ......................................................................................25

48 Fed. Reg. 10605 (Mar. 14, 1983) ......................................................................................2

81 Fed. Reg. 19718 (Apr. 5, 2016) ......................................................................................11

85 Fed. Reg. 34912 (June 5, 2020) ......................................................................................1

**Rules**

Fed. R. Civ. P. 56 ......................................................................................21

**Other Authorities**

124 Cong. Rec. S13994 (Aug. 22, 1978) ......................................................................................25

136 Cong. Rec. H12848-01 (Oct. 26, 1990) ......................................................................................8

H.R. Conf. Rep. No. 95-1474 (1978) ......................................................................................23, 25, 37

S. Rep. No. 101-228 (1989) ......................................................................................5, 7, 8

13A Charles Alan Wright et al., Federal Practice & Procedure § 3531.5 (3d ed. 2008) ..............19

## INTRODUCTION

In this action, Plaintiffs challenge the Air Quality Control, Reporting, and Compliance final rule ("Final Rule") promulgated by the Bureau of Ocean Energy Management ("the Bureau" or "Defendant") on June 5, 2020. 85 Fed. Reg. 34912 (June 5, 2020). The Final Rule kept in place outdated and ineffective regulations governing air pollution from offshore oil and gas operations on the federal Outer Continental Shelf ("OCS") that were promulgated in 1980 and have not been meaningfully updated since that time.

In 2016, the Bureau proposed significant revisions to these regulations that it found were needed to ensure compliance with its statutory mandates under the Outer Continental Shelf Lands Act ("OCSLA") and to account for changes in air pollution control technology since 1980. In the 2020 Final Rule, however, the Bureau rejected these updates without offering any valid basis for doing so. It cited no new reports, studies, or information to justify this abrupt reversal of course. It ignored evidence that the agency itself had published between the proposed and final rules that further supported the need for these changes. Instead, the Bureau cited its allegedly "narrow" authority under OCSLA and the need to "ensure compliance" not with the statute, but with a series of Executive Orders related to energy development.

In doing so, the Bureau finalized a rule that disregarded the legal obligations imposed on it by Congress in favor of pursuing its own unenforceable policy choices that conflict with those obligations, in violation of OCSLA's statutory requirements. The Bureau also violated basic requirements for agency decision-making under the Administrative Procedure Act ("APA") by relying on factors that Congress did not intend it to consider, failing to offer a reasoned explanation for provisions in the Final Rule, drawing conclusions that run counter to the evidence before the agency, and failing to consider important aspects of the problem of air pollution from offshore oil and gas operations.

For these reasons, the Court should set aside the Final Rule and require the Bureau to promulgate a new rule that complies with the requirements of OCSLA and the APA.

## STATUTORY BACKGROUND

### I.     <u>Outer Continental Shelf Lands Act</u>

OCSLA governs the leasing, exploration, and development of oil and gas deposits in the OCS. 43 U.S.C. § 1331 *et seq*. The OCS extends from the outer boundary of state waters to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id*. §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605 (Mar. 14, 1983).

OCSLA charges the Secretary of the Interior with managing oil and gas activities on the OCS. 43 U.S.C. §§ 1334(a), 1344(a).[1] This management "shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf," as well as "the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments." *Id*. § 1344(a)(1). Congress has also directed that the development of resources on the OCS be "subject to environmental safeguards." *Id*. § 1332(3).

Section 5 of OCSLA requires that the Secretary of the Interior "shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions." 43 U.S.C. § 1334(a). OCSLA specifically provides that the Secretary "may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental

---

[1] OCSLA prescribes four, tiered stages for the Secretary to sell and allow development of offshore oil and gas deposits: (1) five-year leasing programs; (2) lease sales; (3) exploration plans; and (4) development and production plans. *Id*. §§ 1337, 1340, 1344, 1351.

Shelf." *Id*. OCSLA further requires that "[t]he regulations prescribed by the Secretary under this subsection shall include, *but not be limited to*, provisions … for compliance with the national ambient air quality standards pursuant to the Clean Air Act (42 U.S.C. 7401 et seq.), to the extent that activities authorized under this subchapter significantly affect the air quality of any State." *Id*. § 1334(a)(8) (emphasis added).

As discussed in detail below, the Bureau regulates air pollution from OCS sources in the Gulf of Mexico and the North Slope Borough of Alaska, while the U.S. Environmental Protection Agency ("EPA") regulates OCS sources elsewhere.

## II.    <u>Clean Air Act</u>

Regulation of air pollution from OCS sources is subject to several provisions of the Clean Air Act, which establishes a comprehensive program for controlling and improving the nation's air quality. 42 U.S.C. §§ 7401 *et seq*. Congress enacted the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." *Id*. § 7401(b)(l). One "primary goal" of the statute is "pollution prevention." *Id*. § 7401(c). Congress found the Clean Air Act to be necessary in part because "the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare." *Id*. § 7401(a)(2). The Clean Air Act is primarily administered by EPA.

The Clean Air Act authorizes EPA to establish national ambient air quality standards ("NAAQS")—the standard referenced in Section 5(a)(8) of OCSLA—for certain widespread air pollutants that endanger public health and welfare. 42 U.S.C. §§ 7407–7410. The NAAQS cover these six "criteria" pollutants that have long been known to endanger public health and welfare: ozone, particulate matter, carbon monoxide, lead, sulfur dioxide, and nitrogen dioxide. *See*

BOEM00027, BOEM03995. Based on the health and welfare impacts of each pollutant, the NAAQS include averaging times, which is the time period over which measurements of each pollutant are averaged (e.g., one hour in the case of the primary sulfur dioxide standard). *See* 42 U.S.C. § 7408(a), (c); 40 C.F.R. Part 50. These standards are regularly updated by EPA. *See* 42 U.S.C. § 7409(d).

The Clean Air Act directs EPA to designate areas with ambient air concentrations that exceed the NAAQS as "nonattainment" areas. *Id.* § 7407(d)(1). For areas in attainment with the NAAQS and other areas with special protections, the Clean Air Act's prevention of significant deterioration ("PSD") program is designed to ensure that these air quality standards are not violated, and that special areas are protected even with the addition of new air pollution sources. *See* 42 U.S.C. §§ 7470–79. The Clean Air Act designates areas such as national parks, national wilderness areas, and national monuments of a certain size as "Class I" areas that are given special protections to minimize air pollution impacts. *Id.* § 7472(a). Other places known as "Class II" areas allow for a moderate amount of air quality deterioration. *Id.* § 7472(b).

Section 328 of the Clean Air Act effectively divides responsibility for regulating air pollution from OCS sources between EPA and the Bureau. *Id.* § 7627. This section, which was added by the 1990 amendments to the Act, mandates that EPA set requirements "to control air pollution from Outer Continental Shelf sources located offshore of the States along the Pacific, Arctic and Atlantic Coasts … to attain and maintain Federal and State ambient air quality standards and to comply with the provisions of part C of subchapter I" (i.e., the PSD program). *Id.* Congress adopted Section 328 after becoming concerned that "construction and operation of OCS facilities emit a significant amount of air pollution which adversely impacts coastal air quality," and that OCS air pollution was "causing or contributing to the violation of Federal and

State ambient air quality standards in coastal regions." S. Rep. No. 101-228, at 76–77 (1989).

Section 328 leaves the Bureau with responsibility to regulate air pollution from OCS sources in

most of the central and western Gulf (in particular, west of 87.5 degrees longitude), as well as the

North Slope Borough of Alaska. 42 U.S.C. § 7627.[2]

       For OCS sources regulated by EPA pursuant to Section 328, pollution control

requirements depend on whether the source is located within 25 miles of a state's seaward

boundary (inner OCS sources) or beyond (outer OCS sources). *Id.* § 7627; 40 C.F.R. Part 55.

Inner OCS sources are regulated the same as comparable onshore sources which vary by state

and air quality status. 42 U.S.C. § 7627(a)(1). Outer OCS sources are subject to several Clean

Air Act programs, including the PSD program. *Id*. The emission threshold that generally triggers

regulation in both areas is the PSD threshold of 250 tons per year ("tpy") of a regulated pollutant.

40 C.F.R. § 52.21(b). Sources that exceed this level are subject to several provisions, including

the requirement to use best available control technology ("BACT") or the even stricter lowest

achievable emissions rate ("LAER") in nonattainment areas. *See id*.; *id*. § 51.165(a)(1)(xiii).

       The NAAQS and PSD increments at the time of the Final Rule, as shown at

BOEM03995, were as follows:

---

[2] Authority over the north coast of Alaska was not part of the 1990 amendments, but was transferred from EPA to the Bureau by a provision in the Consolidated Appropriations Act, 2012 (Pub. L. No. 112-74, 125 Stat. 786) on December 23, 2011.

**Table 1-1. NAAQS and PSD Increments[a]**

| Pollutant | Pollutant/Averaging Time | NAAQS | PSD Class I Increment | PSD Class II Increment |
|---|---|---|---|---|
| CO | 1-hour[b] | **35 ppm** 40,000 µg/m³ | – | – |
| CO | 8-hour[b] | **9 ppm** 10,000 µg/m³ | – | – |
| NO₂ | 1-hour[c] | **100 ppb** 188 µg/m³ | – | – |
| NO₂ | Annual[d] | **53 ppb** 100 µg/m³ | 2.5 µg/m³ | 25 µg/m³ |
| O₃ | 8-hour[e] | **0.070 ppm** 137 µg/m³ | – | – |
| PM₁₀ | 24-hour[f] | **150 µg/m³** | 8 µg/m³ | 30 µg/m³ |
| PM₁₀ | Annual[g] | – | 4 µg/m³ | 17 µg/m³ |
| PM₂.₅ | 24-hour[h] | **35 µg/m³** | 2 µg/m³ | 9 µg/m³ |
| PM₂.₅ | Annual[i] | **12 µg/m³** | 1 µg/m³ | 4 µg/m³ |
| SO₂ | 1-hour[j] | **75 ppb** 196 µg/m³ | – | – |
| SO₂ | 3-hour[k] | **0.5 ppm** 1,300 µg/m³ | 25 µg/m³ | 512 µg/m³ |
| SO₂ | 24-hour | – | 5 µg/m³ | 91 µg/m³ |
| SO₂ | Annual | – | 2 µg/m³ | 20 µg/m³ |
| Pb | 3-Month[l] | 0.15 µg/m³ | – | – |

[a] ppb = parts per billion; ppm = parts per million; µg/m³ = micrograms per cubic meter air
[b] No more than one exceedance per calendar year.
[c] 98th percentile, averaged over 3 years.
[d] Annual mean not to be exceeded.
[e] Fourth-highest daily maximum 8-hour ozone concentrations in a year, averaged over 3 years, NAAQS promulgated December 28, 2015.
[f] Not to be exceeded more than once per calendar year on average over 3 years.
[g] Three-year average of the arithmetic means over a calendar year.
[h] 98th percentile, averaged over 3 years.
[i] Annual mean, averaged over 3 years, NAAQS promulgated December 14, 2012.
[j] 99th percentile of daily maximum 1-hour concentrations in a year, averaged over 3 years.
[k] No more than one exceedance per calendar year (secondary NAAQS).
[l] In areas designated nonattainment for the Pb standards before the promulgation of the current (2008) standards, and for which implementation plans to attain or maintain the current (2008) standards have not been submitted and approved, the previous standards (1.5 µg/m³ as a calendar quarter average) also remain in effect.

## III.  Administrative Procedure Act

The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, governs the procedural requirements for agency decision-making, including the rulemaking process. In promulgating a regulation under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins.*, 463 U.S. 29, 43 (1983) (citation omitted) ("*State Farm*"). Under the APA, a "reviewing court shall … hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. An agency action is

arbitrary and capricious where the agency has (i) relied on factors which Congress has not

intended it to consider; (ii) entirely failed to consider an important aspect of the problem; (iii)

offered an explanation for its decision that runs counter to the evidence before the agency; or (iv)

offered an explanation that is so implausible that it could not be ascribed to a difference of view

or the product of agency expertise. *State Farm*, 463 U.S. at 43. The APA confers a right of

judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

**FACTUAL AND PROCEDURAL BACKGROUND**

I.    **Air Pollution from Oil and Gas Operations on the Gulf of Mexico OCS.**

The Gulf of Mexico is the nation's primary source of offshore oil and gas, accounting for

about 97 percent of all domestic OCS production. *See* Compl. Declaratory & Inj. Relief

("Complaint") ¶ 2, ECF 1; Defs. Answer ("Answer") ¶ 2, ECF 23. As of July 1, 2024, there were

2,360 active oil and gas leases across 12.8 million acres in the Gulf, including 1,511 platforms.

Complaint ¶ 35; Answer ¶ 35. Oil and gas leasing, exploration, development, and production,

along with their associated operations, involve numerous activities that have significant adverse

effects on the Gulf environment. Complaint ¶ 2; Answer ¶ 2. In particular, air emissions from

drilling operations, support vessels, flaring, venting, platform construction and operations, and

other activities result in the release of several air pollutants, including the criteria air pollutants,

volatile organic compounds ("VOCs"), hydrogen sulfide, methane, and ammonia. BOEM00300.

According to a Senate Report from the 1990 Amendments to the Clean Air Act, "The

construction and operation of OCS facilities emit a significant amount of air pollution which

adversely impacts coastal air quality in the United States. Operational emissions from an OCS

platform and associated marine vessels can routinely exceed 500 tons of [nitrogen oxides

("$NO_x$")] and one hundred tons of reactive hydrocarbons annually. … [D]rilling a single

exploratory OCS well can cause emissions in excess of one hundred tons of [$NO_x$]." S. Rep. No.

101-228, at 76–77 (1989); *see* 136 Cong. Rec. H12848-01, H12889 (Oct. 26, 1990).

Air pollutants from OCS oil and gas operations can have serious adverse health and environmental impacts. BOEM04626. Ozone is formed by the chemical reaction between $NO_x$ and VOCs in the presence of sunlight. BOEM00299. Breathing ozone can trigger a variety of health problems including chest pain, coughing, throat irritation, and congestion. BOEM07492–93. It can reduce lung function and inflame the linings of the lungs. *Id*. Exposure can also worsen bronchitis, emphysema, and asthma, and may permanently scar lung tissue. *Id*.

Nitrogen oxides are a group of highly reactive gases that primarily get into the air from the burning of fossil fuels. Complaint ¶ 41; Answer ¶ 41; BOEM00025. Breathing air with high $NO_x$ concentrations can irritate airways in the human respiratory system. BOEM07494–95, BOEM14015–25. Over short periods, such exposures can aggravate respiratory diseases, particularly asthma, leading to respiratory symptoms (such as coughing, wheezing, or difficulty breathing), hospital admissions, and visits to emergency rooms. BOEM01236, BOEM07494–95, BOEM14019. Longer exposures to elevated $NO_x$ concentrations may contribute to the development of asthma and decreased lung function. BOEM07494–95, BOEM14023. People with asthma, as well as children and the elderly, are at greater risk for health impacts. BOEM01236, BOEM07494–95, BOEM14024. The nitrate particles that result from $NO_x$ make the air hazy and decrease visibility. BOEM07538.

Sulfur dioxide ("$SO_2$") is a gas largely resulting from the burning of fossil fuels which can impact both human health and the environment. Complaint ¶ 42; Answer ¶ 42. Short-term exposures to $SO_2$ can harm the human respiratory system and make breathing difficult. BOEM01236–37, BOEM07493–94. People with asthma, particularly children, are sensitive to these effects. *Id*. $SO_2$ can also harm trees and plants by damaging foliage and decreasing growth,

and can contribute to acid rain which can impact sensitive ecosystems. BOEM07510–11, BOEM07527–28. $SO_2$ and other sulfur oxides can react with other compounds in the atmosphere to form fine particles that form haze and reduce visibility, including in parks and wilderness areas. BOEM07538.

Particulate matter ("PM")—regulated under the Clean Air Act as $PM_{10}$ and $PM_{2.5}$—consists of microscopic solids or liquid droplets that are so small that they can be inhaled and cause serious health problems. Complaint ¶ 43; Answer ¶ 43; BOEM07487. Most particles form in the atmosphere as a result of complex reactions of chemicals such as $SO_2$ or $NO_x$. BOEM07487. Particles 10 micrometers in diameter or less (i.e., $PM_{10}$) can get deep into the lungs and even into the bloodstream. Complaint ¶ 43; Answer ¶ 43. These small particles pose the greatest risk to health and are also the main cause of haze in parts of the United States. BOEM07490–91, BOEM07539.

Several counties in coastal Texas and Louisiana are in nonattainment for different pollutants. Complaint ¶ 37; Answer ¶ 37; BOEM03987–88. For example, the Houston-Galveston-Brazoria area in Texas is in nonattainment for the 8-hour ozone standard. BOEM03987–88. The St. Bernard Parish area in Louisiana is in nonattainment for the 1-hour sulfur dioxide standard. *Id*.

Several areas with special protections under the Clean Air Act are located in the Gulf region. Class I areas include Breton Wilderness in Louisiana. BOEM03988. Class II areas include Breton National Wildlife Refuge, Padre Island National Seashore, and Gulf Islands National Seashore. *Id*.

## II.    The Bureau's Regulation of Air Pollution from Offshore Oil and Gas Operations.

As discussed above, Section 5 of OCSLA provides the Bureau with broad authority to prescribe rules and regulations to carry out the provisions of the statute, including rules "to

provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf." 43 U.S.C. § 1334(a). These regulations "shall include, but not be limited to, provisions … for compliance with the national ambient air quality standards pursuant to the Clean Air Act (42 U.S.C. 7401 et seq.), to the extent that activities authorized under this subchapter significantly affect the air quality of any State." *Id.* § 1334(a)(8).

The Bureau's current regulatory scheme to implement these provisions was finalized in 1980 and has remained largely unchanged since that time. *See* 30 C.F.R. Part 550; BOEM00265 ("BOEM administers these existing regulations, which have been fundamentally the same since their publication in 1980."). The program operates as follows. In order to receive approval for an exploration or development plan, lessees must provide "[t]ables showing the projected emissions of criteria air pollutants, volatile organic compounds (VOC), and total suspended particulates (TSP)"[3] for the proposed activities. 30 C.F.R. §§ 550.218, 550.249. The projected emissions are estimates based on the type of equipment used. *Id.*

The Bureau's regulations then rely upon an exemption emissions threshold ("EET"), based on projected emissions and distance from shore to determine if a plan's emissions will have significant impacts on air quality. 30 C.F.R. § 550.303(d). The EET is as follows: EET = 33.3*D. *Id.* In this equation, EET equals the exemption emissions threshold (in tons per year), and D equals the distance from shore in miles. *Id.* Thus, a source located 50 miles from shore would be exempt from air emissions requirements as long as the projected emissions were below an exemption threshold of 1,665 tpy. This figure is several times higher than EPA's PSD

---

[3] EPA replaced "Total suspended particle" with $PM_{10}$ in 1987, but it remains in the Bureau's regulations today. TSP represents PM having a diameter of 100 microns or less; in contrast, $PM_{10}$ represents PM have a diameter of 10 microns or less, while $PM_{2.5}$ represents PM having a diameter of two-and-one-half microns or less. BOEM00264.

thresholds of 100 or 250 tpy. *See* BOEM00145; 42 U.S.C. §§ 7475, 7479(1) (definition of "major emitting facility").

If a source did exceed the EET, it would then conduct air quality modeling (using an approved model) to assess whether its emissions would significantly affect onshore air quality by comparing the projected emissions to "significance levels" established by EPA. 30 C.F.R. § 550.303(e), (f); *see* 40 C.F.R. § 51.165(b)(2). Further requirements would apply if a significance determination is made depending on whether the impacted onshore location is an attainment or nonattainment area. 30 C.F.R. § 550.303(g). There is little opportunity for public input on these determinations.

**III.    The 2016 Proposed Rule.**

In April 2016, the Bureau proposed a major overhaul of its regulations to ensure that it was meeting its statutory mandates under OCSLA and to account for technological advances in air pollution control and industry practices. BOEM00133; 81 Fed. Reg. 19718 (Apr. 5, 2016). The Proposed Rule would have made several significant changes, including: (1) addressing all current criteria pollutants with established NAAQS and precursor pollutants (i.e., pollutants that lead to criteria pollution, such as ammonia, a precursor of $PM_{2.5}$) and appropriate time intervals (i.e., short term and annual limits); (2) changing how lessees evaluate and model emissions, including eventual changes to the EETs, as well as the locations where impacts are calculated; (3) ensuring that standards and emissions thresholds are updated with any EPA revisions to NAAQS; (4) changing the circumstances when pollution controls are required; and (5) requiring the consolidation of emissions from multiple facilities to determine whether combined emissions could jointly cause or contribute to a violation of the NAAQS. BOEM00133–35.

In the Proposed Rule, the Bureau stated several times that these changes were necessary to fulfill its responsibilities under OCSLA Section 5(a)(8) and to ensure ongoing compliance

with the NAAQS. BOEM00133–36. As the Bureau noted, since the original regulations were promulgated in 1980, several changes had been made to the NAAQS—including the specific pollutants regulated and exposure times—which its regulations failed to match. BOEM00136, BOEM00138. Nor are the 1980 regulations consistent with how EPA regulates other areas of the OCS under the Clean Air Act, such as by treating offshore areas within 25 miles of a state boundary as if the sources were located onshore. BOEM00137.

According to its Environmental Assessment for the Proposed Rule, the action is "needed to ensure that BOEM's regulation of OCS air emissions results in compliance with the NAAQS." BOEM00293; *id*. ("[t]he proposed action is needed in order to incorporate current air quality standards related to the NAAQS"). The Bureau stated that the proposed changes would "avoid potential adverse environmental impacts by reducing the amount of NAAQS criteria pollutants emitted as a result of [Bureau]-approved activities on the OCS." BOEM00301. "By reducing emissions of criteria and precursor pollutants, [the Bureau] would, in certain cases, reduce the contribution of OCS facilities' emissions to nonattainment areas, such as ozone in the Houston metropolitan area, preventing future contribution to NAAQS exceedances." *Id*.; BOEM00308 ("Without the proposed revisions to the regulations, BOEM's current regulations would allow for future additional contribution of criteria pollutants to onshore nonattainment areas and other degradation of onshore air quality.").

In the Regulatory Impact Assessment ("RIA") for the Proposed Rule, the Bureau calculated the rule's compliance costs and concluded that it did "not expect that the proposed regulatory changes will be unduly burdensome to industry." BOEM00077. The Bureau also determined that the Proposed Rule was "not a significant energy action" and would not "generate either large negative or positive employment impacts." BOEM00107, BOEM00109. With regard

to benefits, the Bureau found that "[t]he primary benefit of this rule is to ensure that offshore facilities and operations are in compliance with the air quality objectives and requirements of the OCSLA." BOEM00023; *see* BOEM00029 ("The need is to ensure compliance with the NAAQS. …[T]he amendments … are necessary to incorporate current []EPA ambient air quality standards"). Other benefits of the rule "include the anticipated reduction of the level of pollutants due to proposed emission reduction measures or emissions offsets," especially reductions of $NO_x$. BOEM00023; *see* BOEM00102 ("There are numerous non-monetized, qualitative benefits attributable to the rule that would provide for more regulatory certainty and an overall cleaner air environment").

Plaintiffs submitted comments on the Proposed Rule which supported the Bureau's effort to replace its outdated and legally deficient regulations, but also recognized that the proposal fell well short of what the Bureau is authorized to do under OCSLA. BOEM00684–86, BOEM00954–70. In particular, the comments noted that the Bureau has broad authority under 43 U.S.C. § 1334(a) to promulgate rules "for the prevention of waste and conservation of the natural resources of the [OCS]," and that ensuring compliance with the NAAQS was simply the *minimum* of what the Bureau should be trying to achieve. *Id*. The comments further took issue with the Bureau's focus on onshore air quality, its failure to fully consider emissions from support vessels and aircraft, and its continued use of exemption formulas rather than EPA's more protective approach for determining significance and requiring pollution controls. *Id*.

In 2019, prior to the issuance of the Final Rule, the Bureau released a study to evaluate the air quality impacts from the 10 Gulf lease sales proposed in the 2017–2022 5-year plan. BOEM03959. That study found that the lease sales would contribute to criteria air pollution in the Gulf, including to pollutants in nonattainment areas, such as adding up to 14 parts per billion

("ppb") to already elevated ozone levels in the Houston region, and would push at least one site in Texas above the 70 ppb NAAQS attainment threshold for ozone and into nonattainment status. BOEM03990–91, BOEM04201–41. The study also found that this pollution would negatively impact visibility at Breton National Wildlife Refuge off the southeast coast of Louisiana. BOEM03991, BOEM04247. In addition, the study determined that the existing EETs were not sufficiently protective of the short-term NAAQS for any pollutant. BOEM04298–301.

Also in 2019, the National Academies of Sciences, Engineering, and Medicine ("NAS") released a review of the Bureau's air quality study. BOEM04615. As NAS noted, "[e]missions from activities in the Gulf of Mexico Region (GOMR)—including emissions associated with oil and gas exploration, development, and production on the Gulf waters—can result in increased levels of air pollutants that contribute to a range of air quality impacts in the region." BOEM04626. The NAS found that the Bureau "is currently using EETs that were developed in the 1980s, apparently without detailed air quality modeling nor consideration of any long-term NAAQS … They clearly need to be updated to reflect newly regulated pollutants (i.e., $PM_{2.5}$ and $PM_{10}$) and updated (i.e., 8-hour-average ozone, 1-hour-average $NO_2$ and $SO_2$) air quality standards as well as state-of-the-science dispersion and photochemical models." BOEM04658. While NAS found that the Bureau's 2019 study was generally "scientifically appropriate and well documented," there were "certain aspects of the Study [that] were found to lead to potential underestimates of the impacts of GOMR emissions on air quality and EETs that would not identify all cases where additional air quality modeling or emission controls are warranted," resulting in "the potential to underestimate the current and future impacts of OCS emissions on air quality, visibility, and deposition." BOEM04632–33.

IV.    **The 2020 Final Rule.**

The Bureau never finalized the 2016 Proposed Rule prior to the change in presidential administrations. Complaint ¶¶ 3, 68; Answer ¶¶ 3, 68. In early 2017, President Trump issued a series of executive orders that called on federal agencies to review actions that potentially burden domestic energy production and, if appropriate, revise or withdraw such actions. These included Executive Orders 13771 (Reducing Regulation and Controlling Regulatory Costs), 13783 (Promoting Energy Independence and Economic Growth), and 13795 (Implementing an America-First Offshore Energy Strategy). BOEM00316–18, BOEM00319–23, BOEM00324–27. Executive Order 13795 specifically identified the Proposed Rule as one such potential opportunity. BOEM00326.

On June 5, 2020, the Bureau scrapped its proposed revisions and finalized a rule that essentially left its 1980 air quality regulations in place, with only minor administrative updates. BOEM00262. In rejecting the Proposed Rule's changes, the Bureau claimed that its authority under OCSLA was "much narrower" and "more limited" than EPA's authority under the Clean Air Act, and that it was "focused on the six criteria air pollutants" for which EPA has defined NAAQS. BOEM00263, BOEM00269, BOEM00271. In doing so, the Bureau abandoned its proposed regulation of precursor pollutants (except VOCs) which contribute to the formation of the criteria air pollutants, and eliminated proposed changes to modeling, considering emissions from support vessels and vehicles, aggregating emissions from multiple facilities, and evaluating air quality impacts at a state's seaward boundary, among other proposals. BOEM00264–66, BOEM00272–73. As a result, three of the six criteria air pollutants still lack an EET ($PM_{10}$, $PM_{2.5}$ and lead), and none of the criteria pollutants have short-term (rather than annual) EETs. BOEM00271, BOEM00275; *see* 30 C.F.R. § 550.303(d).

In addition to its narrow reading of OCSLA, the other primary rationale offered by the Bureau for rejecting the Proposed Rule's changes was that such requirements would "unduly burden" domestic energy production, contrary to Executive Orders 13771, 13783, and 13795. *See* BOEM00263, BOEM00266, BOEM00268, BOEM00285. Without identifying any new information since its proposal, the Bureau claimed that the Proposed Rule would have "imposed a significant increase in the regulatory burden on industry," and that the Final Rule "avoids adding requirements that could have been unduly burdensome." BOEM00285.

## STANDING

Plaintiffs have demonstrated standing with regard to the claims and relief sought in this action through the declarations submitted with their motion for summary judgment. *See* Declarations of Kenneth Saxon, Terrence Bankston, Jasmine Fournier, Zachary Fabish, and Breon Robinson, filed herewith. Plaintiffs are organizations that have associational standing to sue "on behalf of [their] members when [their] members would otherwise have standing to sue in their own right ... ." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). For members to establish standing, they "must show (1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* Plaintiffs meet these requirements here.

I.    **Plaintiffs Have Demonstrated Concrete, Actual Injuries Resulting from the Final Rule.**

In environmental cases, plaintiffs may satisfy the injury-in-fact requirement by "averring that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw*, 528 U.S. at 183 (cleaned up); *see*

*Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized harm to ... the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice.").

Here, the declarations submitted by Plaintiffs sufficiently demonstrate injury-in-fact through their members' use of areas of the Gulf for recreational, aesthetic, commercial, and scientific purposes, which are injured by the Bureau's decision to approve the Final Rule in violation of OCSLA and the APA. For example, Friends of the Earth member Terrance Bankston describes how poor air quality in the Houston area, which is exacerbated by air pollution from offshore oil and gas operations, has negatively impacted his ability to engage in daily walks and attend outdoor events such as concerts and festivals and resulted in health impacts for which he has sought medical attention. Decl. of Terrance Bankston ("Bankston Decl.") ¶¶ 9, 12–18. Mr. Bankston also regularly visits the Gulf coast in Galveston to recreate on the beach and enjoy outdoor coastal activities, but has been forced to cut back on such trips due to poor air quality and extreme haziness that have greatly diminished these experiences. *Id*. ¶¶ 10–11. Similarly, Center for Biological Diversity member Zachary Fabish describes how ozone pollution in the Houston and Galveston areas, which offshore oil and gas activities contribute to, adversely impacts his ability to engage in recreational activities such as running and wildlife observation. Decl. of Zachary Fabish ("Fabish Decl.") ¶¶ 6–12. Kenneth Saxon, a member of Friends of the Earth and Sierra Club, also discusses how air pollution in the Brownsville area and coastal regions in Texas negatively impact his and his family's ability to swim, surf, fish, and view wildlife in these areas, and states his concerns about the health impacts of poor air quality days on himself and his family. Decl. of Kenneth Saxon ("Saxon Dec.") ¶¶ 9–14; *see also* Decl. of Breon Robinson ("Robinson Decl.") ¶¶ 5–7 (discussing how air pollution in coastal Louisiana

impedes her enjoyment of the outdoors); Decl. of Jasmine Fournier ("Fournier Decl.") ¶¶ 18–20 (discussing how air pollution in the Gulf region negatively impacts her ability to be outside, sail, and enjoy Gulf wildlife and environment).

Based on these declarations, Plaintiffs have demonstrated an injury-in-fact. *See Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 672 (D.C. Cir. 2013) (members' statements that they spend time in areas affected by pollution and have reduced time outdoors in response are "precisely the kinds of harms the Supreme Court has deemed sufficient to show injury in fact"); *Int'l Dark-Sky Ass'n v. Fed. Commc'ns Comm'n*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (finding that declarations from stargazers and astronomers who "'use' the sky and "whose aesthetic and recreational activities will be inhibited by light pollution from the satellites" sufficient to allege an injury in fact); *Clean Wis. v. EPA*, 964 F.3d 1145, 1156 (D.C. Cir. 2020) ("Adverse health effects ... constitute Article III injuries, even if a petitioner merely asserts realistic health concerns instead of providing medical evidence"); *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1016–17 (D.C. Cir. 2014) (finding standing based on declarations of members "who are concerned about the [challenged EPA action's] effects on their health and, in some cases, spend less time outdoors on that account"); *Sierra Club v. EPA*, 926 F.3d 844, 848–49 (D.C. Cir. 2019) (finding that plaintiffs demonstrated injury-in-fact based on declarations stating that members regularly visit national parks adversely impacted by haze contributed by challenged power plant).

II.    **Plaintiffs' Injuries Are Fairly Traceable to the Bureau's Adoption of the Final Rule.**

With regard to the second factor, the Supreme Court has explained that Plaintiffs' injuries must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). Here, the Bureau's decision to adopt the Final Rule and reject

18

significant changes that it had previously determined were necessary to ensure compliance with the NAAQS will result in increased air pollution from OCS oil and gas operations. BOEM00133–36, BOEM00293, BOEM00301, BOEM00308. As the Bureau itself found in its 2019 air quality study, emissions from OCS oil and gas operation are contributing to pollution in nonattainment areas, such as the Houston region, and even pushing one Texas site into nonattainment status. BOEM03990–91, BOEM04201–41; *see also* Bankston Decl. ¶ 19; Fabish Decl. ¶ 14; Saxon Decl. ¶ 32; Robinson Decl. ¶ 6; Fournier Decl. ¶ 24.

Consequently, Plaintiffs' alleged injuries from air pollution resulting from OCS oil and gas operations in the Gulf are fairly traceable to the Bureau's decision to approve the Final Rule. *See WildEarth Guardians v. EPA*, 830 F.3d 529, 535 (D.C. Cir. 2016) ("[t]he health and economic costs of increased ... pollution for individuals in nonattainment areas constitute injuries in fact that are fairly traceable to the EPA's challenged rule"); *Ctr. for Biological Diversity v. Dep't of the Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009) (in challenge to 5-year leasing program, "Interior's adoption of an irrationally based Leasing Program could cause a substantial increase in the risk to [plaintiffs'] enjoyment of the animals affected by the offshore drilling"); *Sierra Club, Lone Star Ch. v. Cedar Point Oil Co.*, 73 F.3d 546, 558 (5th Cir. 1996) (finding traceability for standing purposes where it is shown that defendant's discharge contributes to pollution that impairs plaintiff's use of Gaveston Bay); 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531.5 (3d ed. 2008) (plaintiff can satisfy traceability by showing "that the defendant's conduct is one among multiple causes" of the alleged injury).

**III.    Plaintiffs' Injuries Will Be Redressed by a Favorable Decision Requiring the Bureau to Comply with OCSLA and the APA in Promulgating a New Rule.**

Plaintiffs have also demonstrated redressability. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (Kavanaugh, J.) ("[I]f a government action causes an injury, enjoining the action usually will redress that injury."). To satisfy this element, Plaintiffs must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 181. Plaintiffs "need not show that a favorable decision will relieve [their] every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *see Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (to determine whether an injury will likely be redressed by a favorable decision, courts must "assume for purposes of standing that [the plaintiff] will ultimately receive the relief sought").

Here, if the Court were to find that the Final Rule failed to comply with OCSLA and the APA and require the Bureau to redo its rule, Plaintiffs' members' injuries would likely be redressed by stronger regulations governing OCS oil and gas operations that reduce air pollution and ensure compliance with the NAAQS. *See* Bankston Decl. ¶¶ 20–21; Fabish Decl. ¶ 15; Saxon Decl. ¶¶ 33–34; Robinson Decl. ¶ 7; Fournier Decl. ¶ 25. Consequently, Plaintiffs' injuries are redressable because granting the requested relief would at least mitigate, if not eliminate, the alleged harms. *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 185 (D.C. Cir. 2017) (injury redressable where agency "could reach a different conclusion" following remand of challenged order); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013) (injury redressable because if agency "is required to adequately consider each environmental

concern, it could change its mind about authorizing the lease offering").[4]

## STANDARD OF REVIEW

A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In the APA context, summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Lewis v. Sec'y of Navy*, 195 F.Supp.3d 277, 283 (D.D.C. 2016).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In doing so, a court must determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Courts "do not hear cases merely to rubber stamp agency actions," *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000), but instead consider "whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 105 (D.D.C. 1995) (citations omitted); *accord State Farm*, 463 U.S. at 43. An agency changing course with a new policy must show that it "is permissible under the statute,

---

[4] Plaintiffs also meet the other two factors for associational standing. *See Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). First, the interests they seek to protect are germane to their institutional purposes. *See* Bankston Decl. ¶¶ 6–8; Fabish Decl. ¶¶ 2–3; Saxon Decl. ¶¶ 4–7; Robinson Decl. ¶¶ 2–3; Fournier Decl. ¶¶ 3–10. Second, the relief sought under the APA does not require the participation of individual members. *See Sierra Club v. FERC,* 827 F.3d 36, 43 (D.C. Cir. 2016).

that there are good reasons for it, and that the agency believes it to be better," and a "more detailed justification" is required where the "new policy rests upon factual findings that contradict those which underlay its prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("*Fox*").

When an agency's decision turns upon the construction of a statute, the court reviews the agency's interpretation of the statute *de novo*. *Loper Bright Enterp. v. Raimondo*, 603 U.S. 369, 392 & n.4 (2024). Under *Loper Bright*, "[i]nstead of deferring to [the agency's] interpretation of the [statute]," courts "must apply what [they] regard as the statute's 'best' reading." *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 (D.C. Cir. 2024).

## ARGUMENT

The Final Rule is contrary to the requirements of OCSLA and the APA for several reasons. First, the Final Rule relies upon the Bureau's arbitrary interpretation of its legal obligations under OCSLA and fails to ensure that OCS oil and gas operations do not cause or contribute to violations of the NAAQS. Second, the Bureau relied upon factors which Congress has not intended the agency to consider by attempting to justify the Final Rule based on Executive Orders rather than the statutory requirements of OCSLA. Third, the Bureau failed to provide reasoned explanations for rejecting several changes to its regulations that it previously found were needed to ensure compliance with the statute. Finally, in promulgating the Final Rule, the Bureau failed to consider important aspects of the problem of air pollution from OCS oil and gas operations, such as impacts on environmental justice communities and individuals engaged in recreational activities on nearshore waters, as well as emissions from mobile support vehicles and aircraft. Each of these failures provides a separate basis for finding the rule to be contrary to OCSLA or the APA. *See Air All. Houston v. EPA*, 906 F.3d 1049, 1066 (D.C. Cir. 2018) ("EPA's explanations for its changed position on the appropriate effective and compliance

dates are inadequate under *Fox* and *State Farm*, and therefore arbitrary and capricious, for several reasons").

## I.    The Final Rule Is Arbitrary and Not in Accordance with OCSLA.

The Final Rule violates the APA because it is arbitrary and capricious and not in accordance with OCSLA. *See* 5 U.S.C. § 706(2)(A). First, the Bureau's repeated insistence that it is severely limited in what it can regulate is contrary to the plain language, intent, and legislative history of OCSLA. Second, the Bureau fails to ensure that OCS oil and gas operations do not cause or contribute to violations of the NAAQS, which is contrary to the requirements of OCSLA.

OCSLA requires that the Secretary of the Interior "shall prescribe such rules and regulations as may be necessary to carry out" the provisions of the statute, and "may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf." 43 U.S.C. § 1334(a). OCSLA further mandates that these regulations "shall include, *but not be limited to*, provisions … for compliance with the national ambient air quality standards pursuant to the Clean Air Act (42 U.S.C. 7401 et seq.), to the extent that activities authorized under this subchapter significantly affect the air quality of any State." *Id*. § 1334(a)(8) (emphasis added). OCSLA's legislative history provides that the Department of Interior "shall be guided by the Clean Air Act, in consultation with [EPA], in promulgating regulations to maintain consistency with ambient air quality standards, and its procedures establishing the technological means for controlling air emissions." H.R. Conf. Rep. No. 95-1474, at 86 (1978).

Thus, under the plain language and legislative history of OCSLA, the Bureau, in addition to having to comply with the statutory mandate to ensure compliance with the NAAQS, (1) has broad authority to regulate OCS pollution sources, including for the prevention of waste and

conservation of natural resources, and (2) must be guided by the Clean Air Act and consult with EPA in doing so.

The Bureau's narrow interpretation of its own authority essentially reads these responsibilities and authorities out of the statute. For example, despite OCSLA plainly stating that the Bureau's regulations shall include "but not [be] limited to" ensuring compliance with the NAAQS, the Bureau claims that the Final Rule is justified by the fact that its statutory authority under OCSLA is "limited to ensure compliance with the NAAQS." BOEM00269. This is inconsistent with the plain language of OCSLA. *See United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005) ("The words 'including, but not limited to' introduce a *non-exhaustive* list that sets out specific examples of a general principle." (emphasis added)); *see also California v. Kleppe*, 604 F.2d 1187, 1193–94 (9th Cir. 1979) ("From [the] language [of Section 5(a) of OCSLA], it quite clearly appears that Congress gave the Secretary authority to promulgate air quality regulations for the OCS," and "nothing in the legislative history of the OCSLA … clearly shows … that Congress intended to limit the Secretary's authority in any way[.]"). Moreover, the Bureau ignores that OCSLA provides the agency with broad authority to promulgate regulations for the prevention of waste and conservation of natural resources, 43 U.S.C. § 1334(a), as well as a mandate to consider impacts on the "marine, coastal, and human environments," *id*. § 1344(a)(1). Thus, the Bureau has ample authority to regulate air quality beyond just compliance with the NAAQS. *Id.* § 1334(a).

The Final Rule also improperly limits what compliance with the NAAQS under Section 5(a)(8) of OCSLA entails. For example, while the Proposed Rule recognized repeatedly that addressing all relevant criteria and precursor air pollutants and aligning the Bureau's standards for these pollutants with EPA's standards are needed to ensure compliance with the NAAQS, *see*

BOEM00133–36, the Final Rule instead claims that the Bureau's authority under this Section is "focused" on just the six criteria air pollutants and that the Bureau's allegedly "limited" statutory authority does not warrant alignment of its standards with EPA's. BOEM00263–64, BOEM00285. The Bureau acknowledges that this approach is inconsistent with the Clean Air Act, but attempts to justify the departure by asserting that its authority under OCSLA is "more limited" than EPA's authority under the Clean Air Act. BOEM00271, BOEM00285; *see also* BOEM00269. This new interpretation ignores that OCSLA's legislative history explicitly provides that the Bureau "shall be guided" by the Clean Air Act and EPA in promulgating rules to "maintain consistency" with the NAAQS and in adopting procedures for controlling emissions. H.R. Conf. Rep. No. 95-1474, at 86; *see also* 124 Cong. Rec. S13994, 13997 (Aug. 22, 1978) (Senator Henry Jackson, Chief Sponsor of the Senate OCSLA legislation, noting that "[t]he Secretary [of Interior] is expected to consult closely with EPA and to rely on its technical expertise when incorporating clean air requirements").

The Bureau's 1980 air quality rule recognized that the agency's regulations must "fulfill[] the Congressional intent that the [Bureau] be 'guided by the Clean Air Act, in consultation with [EPA]' in devising [the Bureau's] air quality program." 45 Fed. Reg. 15128 (Mar. 7, 1980). Although noting that there were some differences between the Bureau's and EPA's authority requiring a few deviations from EPA's approach, the 1980 rule "follow[ed] EPA's program" at the time "*to the maximum extent possible*" in order to fulfill this Congressional intent. *Id.* (emphasis added). *See, e.g.*, *Loper Bright*, 603 U.S. at 386, 388 (agency interpretation "issued roughly contemporaneously" entitled to "great weight"); *Edwards' Lessee v. Darby*, 25 U.S. 206, 208–10 (1827) ("very great respect" to construction issued two years after enactment).

Thus, the text and intent of OCSLA confirm that the "best reading" of Section 5(a)(8) is that the Bureau has broad authority to regulate air quality in the OCS, including the authority to regulate beyond the six criteria pollutants and VOCs, and that Congress intended the agency to be guided by the Clean Air Act, including EPA's Clean Air Act program, in fulfilling its mandate. *U.S. Sugar Corp.*, 113 F.4th at 991. The Bureau's construction of its OCSLA authority in the Final Rule conflicts with this best reading and is arbitrary and capricious.

In addition to the Bureau's unlawful statutory interpretation, the Final Rule is also not in accordance with OCSLA because it fails to even ensure that OCS oil and gas operations do not cause or contribute to violations of the NAAQS. The Bureau's own 2019 Gulf of Mexico air quality study found that the oil and gas lease sales proposed in the 2017–2022 5-year plan alone (not accounting for prior or future lease sale activities) would contribute to criteria air pollution in the Gulf, including to pollutants in ozone nonattainment areas, and would push at least one site above the NAAQS ozone attainment threshold; would negatively impact visibility at a national wildlife refuge; and that the current EETs are not sufficiently protective of the short-term NAAQS for any pollutant. BOEM03990–91, BOEM04201–41, BOEM04247, BOEM04298– 301. The NAS's review of the Bureau's study further found that the Bureau's EETs "clearly need to be updated" and that the Bureau was potentially underestimating impacts on air quality. BOEM04632–33, BOEM04658. These studies show that, despite evidence of OCS oil and gas activities significantly affecting states' air quality, the Final Rule—which essentially kept the 1980 rule in place and did not meaningfully update the Bureau's air quality standards—does not ensure "compliance with the national ambient air quality standards pursuant to the Clean Air Act." 43 U.S.C. § 1334(a)(8).

It is also unclear how the Bureau can ensure compliance with the NAAQS when its air quality standards are not even consistent with the NAAQS. For example, the Final Rule does not set hourly thresholds for criteria air pollutants such as $NO_2$ and $SO_2$, even though the NAAQS do. BOEM00276. The Final Rule's EETs do not reflect $PM_{2.5}$ and $PM_{10}$, which are criteria pollutants regulated by the NAAQS. BOEM00287. These are some of the updates that the NAS determined were "clearly need[ed]" for the Bureau's air quality regulations to be consistent with the NAAQS. BOEM04658.

For these reasons, the Final Rule is not in accordance with OCSLA and violates the APA.

## II.   The Bureau's Reliance on Executive Orders to Justify the Final Rule Was Improper.

Along with its unlawful interpretation of OCSLA, the other primary rationale offered by the Bureau for rejecting the Proposed Rule's much-needed updates is that such requirements would unduly burden domestic energy production contrary to Executive Orders 13771, 13783, and 13795. *See* BOEM00263, BOEM00266, BOEM00268, BOEM00285. However, these Executive Orders provide no valid basis for the Final Rule, for several reasons.

First, an agency action is arbitrary and capricious under the APA where the agency has relied on factors which Congress has not intended it to consider. *State Farm*, 463 U.S. at 43. In the Proposed Rule, the Bureau made it clear that changes to its regulations were necessary to ensure compliance with the NAAQS and to fulfill its statutory mandates under OCSLA. BOEM00133–36. The alleged "undue burden" cited by the Bureau is not a factor that Congress intended the agency to consider when regulating air quality from offshore oil and gas operations under OCSLA. *See* 43 U.S.C. § 1334(a).

Second, as these executive orders recognize, a President cannot "impair or otherwise affect" the statutory mandates imposed on the Bureau by Congress. BOEM00317, BOEM00322,

27

BOEM00326; *see In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013) ("[T]he President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress."); *California v. Bernhardt*, 472 F.Supp.3d 573, 605 (N.D. Cal. 2020) ("A president's Executive Order cannot 'impair or otherwise affect' statutory mandates imposed on [an agency] by Congress" (citation omitted)). If there is any conflict between a statute and an executive order, the statute controls. *See Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1332–34 (D.C. Cir. 1996); *Marks v. Cent. Intelligence Agency*, 590 F.2d 997, 1003 (D.C. Cir. 1978) ("[A]n executive order cannot supersede a statute."); *see also PFLAG, Inc. v. Trump*, -- F.Supp.3d --, 2025 WL 685124, *1 (D. Md. Mar. 4, 2025) (holding that "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes" by issuing an Executive Order); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, -- F.Supp.3d --, 2025 WL 597959, *15 (D.D.C. Feb. 25, 2025) ("Agencies 'are creatures of statute' and are therefore subject to the limits prescribed by Congress. In other words, they 'literally ha[ve] no power to act' except to the extent Congress [has] authorized." (citations omitted)).

Not surprisingly, courts have repeatedly rejected attempts by federal agencies to use executive orders as a justification to ignore statutory commands or completely change course on an action. *See New York v. Trump*, -- F.Supp.3d --, 2025 WL 715621, *9–11 (D. R.I. Mar. 6, 2025) (finding likelihood of success on claim that agency defendants violated statutory requirements to carry out categorical federal funding freeze to comply with executive orders); *Becerra v. Dep't of the Interior*, 381 F.Supp.3d 1153, 1169–70 (N.D. Cal. 2019) (Interior failed to provide "reasoned explanation" for its reliance on Executive Order 13783 to justify rule

repeal); *Bernhardt*, 472 F.Supp.3d at 604–06 (agency failed to explain Executive Order 13783 justified final rule).

Third, the Bureau's conclusory statements regarding undue burdens not only lack support but are also directly contradicted by evidence in the record. *See Amerijet Int'l v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (conclusory agency statements deemed insufficient to provide reasoned explanation); *State Farm*, 463 U.S. at 43 (agency action arbitrary and capricious where explanation runs counter to the evidence before the agency); *California v. Bureau of Land Mgmt.*, 286 F.Supp.3d 1054, 1067 (N.D. Cal. 2018) (finding that agency failed to "point to any fact that justifies its assertion that the [rule] encumbers energy production"). As discussed above, the Bureau's RIA calculated the Proposed Rule's compliance costs and concluded that it did "not expect that the proposed regulatory changes will be unduly burdensome to industry." BOEM00077. The Bureau also found the Proposed Rule was "not a significant energy action," as it was not likely to "have a significant adverse effect on the supply, distribution, or use of energy." BOEM00107. The Bureau further stated that the Proposed Rule would not have significant impacts on investment decisions, and would not "generate either large negative or positive employment impacts." BOEM00107–09. The Bureau failed to provide any new information or evidence to support its statements in the Final Rule that the proposed changes would have "imposed a significant increase in the regulatory burden on industry" or would have been "unduly burdensome." *See* BOEM00285.

Finally, the Bureau's conclusory discussion failed to consider other important provisions of the Executive Orders that are relevant to the Final Rule. For instance, as compared to the proposed changes, the Final Rule is expected to result in increased air pollution and violation of air quality standards that impact public health and welfare. *See supra* pp. 11–15. Yet the Bureau

entirely failed to address Executive Order 13783's statement that "[i]t is in the national interest to promote *clean and safe* development of our Nation's vast energy resources," and direction that "all agencies should take appropriate actions to *promote clean air* and clean water for the American people." BOEM00319 (emphases added).

In short, the Executive Orders cited by the Bureau provide no valid basis for its rejection of the proposed changes and adoption of the Final Rule.

## III.    <u>The Bureau Failed to Provide a Reasoned Explanation for the Final Rule.</u>

In promulgating a regulation under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). When an agency "has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (citation omitted). When the regulation reflects a change to the agency's previous policy, the agency must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *Organized Vill. of Kake v. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) ("*State Farm* teaches that even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation"). The agency must at least "display awareness that it is changing position" and "show that there are good reasons for the new policy." *Encino*, 579 U.S. at 221 (citation omitted). Courts apply a heightened standard requiring a "more detailed justification" where the agency's new policy "rests upon factual findings that contradict those which underlay its prior policy" or "disregard[] facts and circumstances that underlay ... the prior policy." *Fox*, 556 U.S. at 515–16.

Here, the Bureau failed to provide reasoned explanations for rejecting the changes it had

proposed to ensure compliance with OCSLA, and instead retaining regulations that it admits "have been fundamentally the same since their publication in 1980." BOEM00265. The Bureau cited no new studies or information that would justify changing course from the Proposed Rule. *See Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010) (agency's contradictory findings, based on an unchanged record, "raise questions as to whether the agency is fulfilling its statutory mandates impartially and competently"). The Bureau's Final Rule is also contrary to evidence in the record. *See, e.g.*, *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017) (an agency acts arbitrarily and capriciously when it "fail[s] to reasonably reflect upon the information contained in the record and grapple with contrary evidence").

To provide some examples, first, the Final Rule rejected without providing reasoned justification the Proposed Rule's proposed updates to exemption emission thresholds and significance levels. For example, the Proposed Rule noted that, "[a]s a result of the new environmental exemption studies, … a new set of formulas will be developed to update the EET formulas currently in place. On an ongoing basis thereafter, [the Bureau] would update the EETs to reflect changes in the NAAQS, [significance levels], and [ambient air increments]; advances in measurement and modeling technology; changes in pre-existing pollution levels in the potentially affected States; and various other factors." BOEM00156. But the Final Rule declined to update the EETs as proposed—resulting in the vast majority of sources going unregulated— and provided no reasoned explanation for doing so. BOEM00266–67, BOEM00287. This is despite the 2019 Gulf of Mexico air quality study and peer review which found that the EETs are inadequate and "clearly need" updates. BOEM00265, BOEM03959, BOEM04658; *see Fred Meyer*, 865 F.3d at 638. Moreover, the Final Rule provided no reasoned explanation for its decision not to adopt the Proposed Rule's policy of periodically updating the EETs and

31

significance levels to reflect changes to the NAAQS, technological advances, and other factors.

Second, the Final Rule claimed—without providing evidence in support—that adopting the Proposed Rule's changes would prevent it from complying with statutory timeframes for reviewing exploration or development plans. BOEM00266. To the contrary, the Bureau found in the RIA for the Proposed Rule that "[t]he proposed requirements are intended to improve [the Bureau's] review and approval of planned operations by requiring more accurate information and better assessments of the air quality impacts from OCS oil and gas operations." BOEM00077–78.

Third, the Proposed Rule sought to eliminate the standard for total suspended particles—which has not been an EPA-regulated pollutant since the 1980s—and instead establish thresholds for $PM_{10}$ and $PM_{2.5}$, which are the standards EPA created to replace the TSP standard. BOEM00192. The Proposed Rule noted that, "[b]ecause the []EPA standard has been in place for many years, the majority of OCS operators have already adopted this standard, and BOEM has largely replaced TSP with $PM_{10}$." *Id.* The Final Rule, however, retained TSP for its EET formulas, claiming that it lacked an "adequate scientific basis" for revising the formulas. BOEM00264; *see* BOEM00271. The Bureau did not provide evidence to support this position, nor did it explain how and why its own recent studies—which evaluated $PM_{10}$ and $PM_{2.5}$ emissions—did not provide sufficient basis for revision. *See* BOEM03959, BOEM04615, BOEM03901, BOEM00264 (the Final Rule noting that the Bureau's completed Gulf of Mexico air quality study and Alaska air quality study "provide insights into the EET formulas," but failing to discuss the insights or why the insights do not provide adequate bases for revising the

formulas).[5] Given that the Final Rule itself recognizes that "TSP is a largely-outdated measure of the mass concentration of PM in the air," BOEM00276, the Bureau must have provided a reasoned justification for why it is keeping this outdated threshold intact. *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013) ("when an agency acknowledges that its data are either outdated or inaccurate, it should, at the very least, analyze the new data or explain why it nevertheless chose to rely on the older data").

Fourth, the Final Rule rejected consideration of emissions from transiting support vessels and other mobile support crafts ("MSC") occuring beyond 25 miles of an OCS facility. BOEM00266. But the Proposed Rule and public comments contain significant factual findings supporting the need to regulate air pollution from such MSCs. The Proposed Rule cited evidence showing that MSC emissions make up a substantial portion of total OCS emissions. BOEM00151. For example, in the Alaska region, MSCs "generate far more emissions than the facilities they support, [such that] not accounting for their emissions makes it impossible to appropriately avoid authorizing activity causing or contributing to a violation of the NAAQS." *Id*. "In the Alaska region, a typical ratio of MSC emissions to facility emissions would be in the range of 80% to 20%." *Id.* The record similarly contains evidence that, in the Arctic, MSCs may account for more than 90 percent of the total emissions associated with drilling. BOEM00151–52, BOEM00959–60, BOEM02100. The record also contains evidence that aircraft engines produce a range of harmful air pollutants, including carbon dioxide, $NO_x$, $SO_2$, carbon monoxide, partially combusted or unburned hydrocarbons, and particulate matter, with significant

---

[5] The Bureau allegedly rejected replacing TSP with $PM_{10}$ in the existing EET formula because "doing so would have the effect of lowering the air quality standards for particulates." BOEM00276. But the Bureau does not explain why it could not revise the EETs or its EET-based approach in order to adequately capture $PM_{2.5}$ and $PM_{10}$ emissions, rather than merely considering whether to "simply substitute" $PM_{10}$ for TSP. *Id.*

percentages occurring during takeoffs and landings (e.g., near offshore infrastructure).
BOEM00960–61. The Final Rule failed to address, let alone grapple with, these findings
supporting regulation of air pollution from these support vessels, vehicles, and aircrafts.

Fifth, the Proposed Rule considered air quality to states' seaward boundaries (3 to 9 miles
from the coast), rather than simply onshore, because states are responsible for attainment of the
NAAQS over the entirety of the state (i.e., over the states' onshore lands and submerged lands)
and because evidence shows that changes in air quality causes impacts to human health off the
coast in nearshore areas. BOEM00154. In deciding to only evaluate air quality impacts to a
state's shoreline rather than the seaward boundary, the Final Rule failed to address this evidence.
The Final Rule claimed that Congress intended to "focus on the health effects on the onshore
population." BOEM00278. Even if that were true (which it is not, *see infra* pp. 36–37), the
record shows that air quality above states' submerged lands has health effects on "the onshore
population" because state residents spend significant time in nearshore waters. BOEM00154,
BOEM07452, BOEM08188, BOEM08258, BOEM08273; *see also* BOEM00959, BOEM01227–
30, BOEM00685. It was arbitrary for the Bureau to ignore this evidence.

Sixth, the Final Rule retained only annual thresholds, rather than setting hourly thresholds
for pollutants like $NO_2$ and $SO_2$ to comply with the NAAQS. BOEM00287. The Final Rule
provides no explanation for this decision. The Final Rule ignores that, as the Proposed Rule had
noted, EPA has adopted 1-hour NAAQS for $NO_2$ and $SO_2$. BOEM00146; *see* 40 C.F.R. §
50.11(b) (1-hour national ambient air quality standard for $NO_x$); *id.* § 50.17(b) (1-hour national
ambient air quality standard for $SO_2$). This Final Rule also ignores the evidence in the record that
human health is adversely affected by short-term exposure to air pollution from $NO_2$ and $SO_2$.
BOEM00146, BOEM00962 (citing EPA's findings regarding health effects from short-term $NO_2$

and SO$_2$ exposures).

Thus, because the Bureau failed to provide reasoned explanations and failed to account for evidence in the record, the Final Rule is arbitrary and capricious in violation of the APA.

**IV.**     **The Bureau Failed to Consider Important Aspects of the Problem of Offshore Oil and Gas Pollution.**

The Bureau's adoption of the Final Rule is also arbitrary and capricious because the agency failed to consider important aspects of the problem of air pollution from OCS oil and gas operations. *See State Farm*, 463 U.S. at 43; *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (failure to consider an important aspect of the problem "alone renders [agency] decision arbitrary and capricious"); *FEC v. Rose*, 806 F.2d 1081, 1088 (D.C. Cir. 1986) ("A determination that an agency made a decision without considering a relevant factor leads to condemning the decision as 'arbitrary and capricious.'"). In adopting the Final Rule, the Bureau failed to consider several issues that were raised in comments or discussed in the record relating directly to the Bureau's statutory obligations to consider the impacts of OCS oil and gas operations on marine, coastal, and human environments and ensure compliance with the NAAQS. *See* 43 U.S.C. §§ 1334(a)(8), 1344(a)(1).

First, the Bureau failed to consider the impacts of air pollution from OCS oil and gas operations on nonattainment areas and environmental justice communities already overburdened with such pollution. OCSLA is clear that the Bureau's Final Rule must ensure compliance with the NAAQS. *Id.* § 1334(a)(8). As EPA has repeatedly recognized, ensuring compliance with NAAQS "is emblematic of achieving a level of public health protection that, based on the level of protection afforded by the NAAQS, demonstrates that minority or low-income populations will not experience disproportionately high and adverse human health or environmental effects

due to exposure to relevant criteria pollutants." BOEM01224–25; *see also* BOEM01107, BOEM01215, BOEM08168–69, BOEM08259–60.

As discussed above, the Bureau itself stated that the Proposed Rule's changes were necessary to fulfill its responsibilities under OCSLA Section 5(a)(8) to ensure ongoing compliance with the NAAQS. BOEM00133–36. The Bureau's environmental assessment found that the proposed changes would lower emissions of criteria pollutants and "reduce the contribution of OCS facilities' emissions to nonattainment areas, such as ozone in the Houston metropolitan area, preventing future contribution to NAAQS exceedances." BOEM00301, BOEM00308 ("Without the proposed revisions to the regulations, BOEM's current regulations would allow for future additional contribution of criteria pollutants to onshore nonattainment areas and other degradation of onshore air quality."). And the Bureau's own air quality study determined that OCS oil and gas operations were elevating pollution levels in nonattainment areas and even pushing one area into nonattainment status. BOEM03990–91, BOEM04201–41. In rejecting the proposed changes in the Final Rule, the Bureau entirely failed to consider these impacts. To the contrary, without any evidence or support, the Bureau stated that the Final Rule would have "no environmental impact consequences." BOEM00236. This omission renders the Final Rule arbitrary and capricious. *See Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C. Cir. 1986) (agency must provide more than "conclusory statements" to prove it "consider[ed] [the relevant] priorities").

Second, the Bureau failed to consider the impacts of OCS air pollution on individuals engaged in recreational activities on nearshore waters. In the Proposed Rule, the Bureau proposed to move the boundary at which air quality compliance is determined from the coastline to the State seaward boundary. BOEM00135, BOEM00153–54. This was based on the Bureau's

recognition that the term "State" in section 5(a)(8) should include the entire area of a State's

jurisdiction extending to its seaward boundary, and that air pollution over these waters can have

significant air quality impacts. *Id.* In comments on this proposed update, Plaintiffs noted that:

> State residents may spend time on the ocean at significant distances from shore
> and states possess an important interest in maintaining the air quality at these
> distances for the health and welfare of people living in their state. For example,
> Alaska Native hunters from coastal communities in the North Slope Borough rely
> upon a clean, healthy environment to support traditional subsistence practices and
> report that subsistence hunting activities involve travel as far as 60 miles out to
> sea. Likewise, recreational activities and commercial fishing occur at considerable
> distances from the shoreline throughout the Gulf of Mexico.

BOEM00959; *see* BOEM01227–30 (discussing subsistence use areas and activities on and

around federal OCS), BOEM00685 (agreeing with legal interpretation of section 5(a)(8) and

noting that "Alaska residents frequently venture beyond state waters to carry out subsistence

hunting practices").

In the Final Rule, the Bureau dropped this proposed change by claiming "practical

difficulties" with measuring offshore air quality and alleging that the expressed intent of

Congress was to "focus on the health effects on the onshore population." BOEM00269,

BOEM00277–78 (citing S. Rep. 95-1091 (1978)). However, the 1978 OCSLA amendments

expressed Congress' clear concern about the "environmental impacts on the human, marine, and

coastal environments of the outer Continental Shelf and the coastal areas which may be affected

by oil and gas or other mineral development in such area or region," and "the impacts of

development offshore on the affected and coastal areas." 43 U.S.C. § 1346(a)(1), (3). Moreover,

Congress made clear that "the Secretary of Interior shall be guided by the Clean Air Act, in

consultation with the Environmental Protection Agency, in promulgating regulations to maintain

consistency with ambient air quality standards." H.R. Conf. Rep. No. 95-1474, at 86. The Clean

Air Act regulates OCS sources within 25 miles of a state's coastline the same as comparable

onshore sources. 42 U.S.C. § 7627(a)(1). Yet in dropping the proposed boundary change in the Final Rule, the Bureau failed to consider the air quality impacts on residents who spend significant amounts of time on nearshore waters.

Third, the Proposed Rule and public comments contain significant factual findings supporting the need to better account for and regulate emissions from vessels and other MSCs. Since its initial regulations were introduced in 1980, the Bureau only required that operators consider emissions from MSCs that occur within 25 miles of an OCS facility. BOEM00151. As the Bureau found, "[t]his method of attributing emissions does not provide the most accurate picture of the effects of [the Bureau's] plan approval on the State's air quality," especially for facilities located further from a state's shoreline. *Id*. Moreover, the Bureau determined that facilities only account for 45 percent of all OCS emissions associated with oil and gas exploration and production, and MSC emissions account for a much greater share than they historically did. *Id*. Consequently, the Bureau proposed that operators report and attribute MSC emissions to facilities whenever such vessels are actually providing operational support, regardless of distance from the facility. BOEM00152.

Plaintiffs generally supported this proposed change and further requested that the Bureau include aircraft emissions in this analysis. BOEM00959–61, BOEM00685. As Plaintiffs noted, aircraft engines produce a range of harmful air pollutants, and a significant number of flights and flight hours are spent in support of oil and gas operations, especially in the Gulf. *Id.* Moreover, as the Bureau's own 2019 air quality study found, pollution from new platforms and associated MSCs and aircraft under 2017–2022 5-year program pushed one Texas site into nonattainment status for ozone when all of these sources were included. BOEM04201.

38

In the Final Rule, the Bureau rejected these proposed changes by claiming that vessel traffic to or from OCS activities was not an activity "authorized" by OCSLA, and that there were "practical difficulties" with preparing plans that account for such emissions. BOEM00273. These explanations make little sense given that the Bureau has always required operators to consider vessel emissions to some extent (emissions from support vessels within 25 miles of their facilities), a requirement unchanged by the Final Rule. *Id*. Moreover, the Final Rule says nothing about aircraft emissions, which the Bureau has repeatedly demonstrated can be estimated and considered. *See, e.g*., BOEM03781–84, BOEM03922–23. Nor does the Final Rule address the Bureau's own finding that mobile source emissions from OCS oil and gas operations are contributing to violations of the NAAQS.

As this Court has stated, when an agency "is confronted with evidence that its current regulations are inadequate or the factual premises underlying its prior judgment have eroded, it must offer more to justify its decision to retain its regulations than mere conclusory statements." *Env't Health Tr. v. F.C.C.*, 9 F.4th 893, 903 (D.C. Cir. 2021). "Rather, the agency must provide assurance that it considered the relevant factors, and it must provide analysis that follows a discernable path to which the court may defer." *Id*. (cleaned up). Here, the Bureau's failure to consider the relevant factors related to its regulation of air pollution from OCS oil and gas operations or to provide anything more than conclusory explanations for much-needed updates to its regulations render the Final Rule arbitrary and capricious.

## REMEDY

The Bureau's violations of OCSLA and the APA require vacatur of the Final Rule. Vacatur is the ordinary remedy for unlawful agency action under the APA, which provides the cause of action for the claims raised in this case. 5 U.S.C. § 706(2)(A) (directing "reviewing court" to "hold unlawful and set aside" arbitrary or unlawful agency action); *Am. Bioscience,*

*Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (stating that, where a plaintiff "prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order"); *Ill. Pub. Telecomms. Ass'n v. F.C.C.*, 123 F.3d 693, 693 (D.C. Cir. 1997) ("the practice of the court is ordinarily to vacate" an unlawful rule); *Petroleum Commc'ns, Inc. v. F.C.C.*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.").

The Supreme Court has repeatedly described this remedy as mandatory. *See Regents of Univ. of Cal.*, 591 U.S. at 1901 ("we conclude that the Acting Secretary did violate the APA, and that the rescission must be vacated"); *F.C.C. v. Nextwave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) ("The [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A)); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." (citation omitted)). Moreover, the limited exceptions to the default remedy of vacatur—namely, that there is "at least a serious possibility" that the agency could substantiate its reasoning on remand, or that vacatur would be highly disruptive—do not apply here. *See Allied Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

## CONCLUSION

For the foregoing reasons, Plaintiffs ask this Court to declare that the Bureau's issuance of the Final Rule violated the APA and OCSLA, vacate and set aside the Final Rule, and order the Bureau to issue new air quality regulations that comply with the law.

Respectfully submitted this 7th day of March, 2025.

/s/ George Torgun
George Torgun (*pro hac vice*)
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
gtorgun@earthjustice.org

Rumela Roy (*pro hac vice*)
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
303-996-9623 Telephone
415-217-2040 Fax
rroy@earthjustice.org

Stephen D. Mashuda (DC Bar No. WA0005)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
415-217-2040 Fax
smashuda@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf, Friends of the Earth, Center for Biological Diversity, Oceana, and Sierra Club*