UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEALTHY GULF, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BUREAU OF OCEAN ENERGY MANAGEMENT,<br><br>Defendant,<br><br>and<br><br>AMERICAN PETROLEUM INSTITUTE,<br><br>Intervenor-Defendant. | Case No. 1:24-cv-02175 (TNM) |

## MEMORANDUM OPINION

The Bureau of Ocean Energy Management has long regulated emissions from oil and gas production at sea.  In 2016, the agency published a Proposed Rule that envisioned overhauling its regulatory program.  In 2020, it issued a Final Rule that walked back many of the Proposed Rule's recommendations.  Unsatisfied with the agency's incremental approach, multiple environmental groups sued.  They assert that the Final Rule violates the Administrative Procedure Act in several respects.  The American Petroleum Institute intervened as a defendant. Having reviewed the parties' cross-motions for summary judgment, the Court concludes that Plaintiffs have standing but falter on the merits.  Although Plaintiffs meet the governing standard for environmental (and associational) standing, they fail to establish that the Final Rule was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See* 5 U.S.C. § 706(2)(A).  The Court will thus grant summary judgment for Defendants.

## I.  BACKGROUND

### A.  The Relevant Statutes

The Outer Continental Shelf ("OCS") is the "area of submerged lands, subsoil, and seabed that lies between the outer seaward reaches of a state's jurisdiction and that of the United States."  *Ctr. for Biological Diversity v. DOI*, 563 F.3d 466, 472 (D.C. Cir. 2009); *see* 43 U.S.C. § 1331(a).  It is a hub of oil and gas production, especially in the waters off the Gulf Coast. *See Ctr. for Biological Diversity v. Burgum*, --- F. Supp. 3d ---, 2026 WL 180258, at *1 (D.D.C. 2026).  Congress established the framework for those activities in the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–1356c.  The statute describes the OCS as "a vital national resource . . . which should be made available for expeditious and orderly development, subject to environmental safeguards."  *Id.* § 1332(3).

OCSLA allows the Secretary of the Interior to regulate oil and gas leasing on the OCS. *Id.* § 1334(a).  He delegated this power to two subordinate agencies, including the Bureau of Ocean Energy Management ("the Bureau").  Dep't of Interior, Secretarial Order No. 3299 (May 19, 2010).  Under OCSLA, the Secretary "may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the [OCS]."  43 U.S.C. § 1334(a).  The statute specifies that "[t]he regulations prescribed by the Secretary under this subsection shall include, but not be limited to" eight categories.  *Id.* § 1334(a)(1)–(8).  The last of the eight buckets authorizes the Secretary to issue regulations "for compliance with the national ambient air quality standards pursuant to the Clean Air Act (42 U.S.C. 7401 et seq.), to the extent that activities authorized under this subchapter significantly affect the air quality of any State." *Id.* § 1334(a)(8).

The Clean Air Act is Congress's main vehicle for "protect[ing] and enhanc[ing] the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1). It requires the Environmental Protection Agency to regulate "criteria pollutants" that endanger public health and welfare. *Id.* § 7408. In particular, the EPA must set National Ambient Air Quality Standards ("NAAQS"), which dictate the criteria pollutants' maximum allowed concentrations in the ambient air. *Id.* § 7409. The EPA currently sets NAAQS for six pollutants: sulfur oxides, particulate matter,[1] ozone, carbon monoxide, oxides of nitrogen, and lead. *See* 40 C.F.R. §§ 50.4–50.21 (2026). The Clean Air Act divides each state into "air quality control regions," which are classified as "attainment," "nonattainment," or "unclassifiable" depending on their concentrations of each pollutant. 42 U.S.C. § 7407(d). The Act gives the Bureau jurisdiction over OCS emissions in large parts of the Gulf and in certain waters off Alaska. *Id.* § 7627(b). The EPA retains jurisdiction over the rest of the OCS. *Id.* § 7627(a)(1).

### B. The Bureau's Regulations

Interior has long regulated air quality under OCSLA. A.R., ECF No. 40, at BOEM00001. It has an established process for reviewing emissions from offshore oil and gas facilities. That process starts by comparing the facility's emissions of each pollutant with the corresponding Emissions Exemption Threshold ("EET"), a benchmark that accounts for emissions volume and distance from shore. *Id.* at BOEM00019, BOEM00274. If the facility's emissions are below or equal to the EET, then it is exempt from further air quality review. *Id.* at BOEM00019.

---

[1] The current NAAQS have different standards for $PM_{10}$ (particulate matter with a diameter less than or equal to 10 micrometers) and $PM_{2.5}$ (less than or equal to 2.5 micrometers). *See* 40 C.F.R. §§ 50.6, 50.7.

Non-exempt facilities need to do more.  They must further measure their emissions and compare them to a table of "significance levels," which set targets for pollutant concentrations in ambient air.  *Id.*  If a facility's pollutant concentration over a particular timeframe (ranging from hourly to annually) exceeds the significance level, then the agency deems it "to significantly affect the air quality of the onshore area for that air pollutant."  *Id.*  The facility's operator must then use the "best available control technology" to reduce emissions.  *Id.*

### C.  The Proposed and Final Rules

In 2016, the Bureau published its Proposed Rule on Air Quality Control, Reporting, and Compliance.  81 Fed. Reg. 19718 (Apr. 5, 2016); A.R. at BOEM00133–231.  That document "propos[ed] to revise [the Bureau's] air quality regulations with a new set of regulations that reflect[ed] a number of policy changes."  *Id.* at BOEM00135.  Those changes included expanding the term "attributed emissions" to include emissions from mobile support craft operating more than 25 miles from an offshore facility and "revising the boundary at which [the Bureau] determines air quality compliance to the State seaward boundary . . . rather than the coastline."  *Id.* at BOEM00135, BOEM00150–53.

The Proposed Rule also set out to "modify[] the process by which [EETs] are established and updated."  *Id.* at BOEM00135.  Under the revised process, the Bureau would consider updating its EETs whenever the EPA changed the NAAQS.  *Id.* at BOEM00155.  At the same time, the Bureau clarified that "[t]he current EETs would continue in place . . . until the relevant air quality studies have been completed and new EETs, if necessary, are developed and implemented."  *Id.* at BOEM00156.  After all, the Bureau explained that "the scientific basis for determining the potential impacts on the States of OCS emissions ha[s] not yet been established."  *Id.*  To help inform its regulatory judgment, the Bureau invited comments on the

Proposed Rule—of which it received 81 from stakeholders including industry groups and environmental organizations. *See id.* at BOEM00267.

In 2020, the Bureau followed up with the Final Rule. 85 Fed. Reg. 34912 (June 5, 2020); A.R. at BOEM00262–88. That Rule made various updates to the Bureau's regulatory framework, including revising the significance levels to match the EPA's current regulations. *Id.* at BOEM00264–65. One part of that change was replacing the significance level for Total Suspended Particulates ("TSP") with $PM_{2.5}$ and $PM_{10}$, tracking the EPA's NAAQS. *Id.* at BOEM00264. By contrast, the Bureau held on to the existing EETs because it "d[id] not believe that it ha[d] an adequate scientific basis for establishing new formulas." *Id.* at BOEM00273.

The Final Rule also rejected several other of the Proposed Rule's provisions. As the Bureau recognized, "[t]he proposed rule would have significantly revised the existing regulations and would have more closely aligned [Interior's] regulations with those of the [EPA]." *Id.* at BOEM00266. That overhaul was unwarranted considering "the extensive public comments [the Bureau] received to the proposed rule." *Id.* In particular, the agency emphasized that the Proposed Rule's more ambitious changes would "unduly burden the industry," "possibly raise legal questions regarding [the Bureau's] authority to adopt some of the proposed changes," and "potentially prevent [the Bureau] from complying with the statutorily mandated timeframes for completing exploration and development plan reviews." *Id.* For those reasons, the Final Rule "incorporate[d] a limited number of the changes in the proposed rule" while "retain[ing] the fundamental structure of the existing regulations." *Id.*

### D. Procedural History

Unhappy with the Final Rule, Healthy Gulf and four other environmental organizations (collectively, "Healthy Gulf") sued the Bureau under the Administrative Procedure Act.

Compl., ECF No. 1.  Healthy Gulf faults the agency for "rejecting significant changes" from the Proposed Rule and instead "ke[eping] in place outdated and ineffective regulations."  *Id.* ¶ 1.  In Healthy Gulf's eyes, the Bureau infringed the APA in multiple ways, "including by failing to offer a reasoned explanation for provisions in the Final Rule, drawing conclusions that run counter to the evidence before the agency, failing to consider important aspects of air pollution from offshore operations, and acting contrary to OCSLA."  *Id.*  The American Petroleum Institute ("API") intervened as a defendant.  *See* Min. Order Oct. 10, 2024.  All parties cross-moved for summary judgment, and their motions are now ripe.

## II.  LEGAL STANDARD

Federal courts "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  The Court must ensure that it has jurisdiction and dismiss the case if it does not.  *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007); *see also* Fed. R. Civ. P. 12(h)(3).  "To establish jurisdiction, the court need only find one plaintiff who has standing."  *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

For cases within the Court's jurisdiction, "[s]ummary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *AID Atlanta, Inc. v. HHS*, 340 F. Supp. 3d 1, 4 (D.D.C. 2018) (cleaned up).  The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

The parties quarrel over Healthy Gulf's standing and the merits.  The Court takes each in turn.

### III.  STANDING

"Article III standing is a bedrock constitutional requirement . . . ."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (cleaned up).  As the party invoking the Court's jurisdiction, Healthy Gulf "must demonstrate standing to do so."  *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013).  It is suing on its members' behalf, Compl. ¶ 12, and so must show that "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to [its] purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).[2]

As is typical, the dispute centers around prong one.  *See* Bureau Mot. Summ. J., ECF No. 30-1, at 17–18.  The Bureau is right to save its ink on the other elements.  Healthy Gulf's lawsuit is germane to its purpose of "protect[ing] and restor[ing] the [Gulf's] natural resources," Compl. ¶ 12, and it does not require individual members' participation.  *See Laidlaw*, 528 U.S. at 181. The Court hence turns to whether at least one of Healthy Gulf's members would have standing to sue—that is: whether he suffered "an injury [that is] concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

Healthy Gulf's bid for standing rests on declarations from its members.  *See* Robinson Decl., ECF No. 28-2; Fournier Decl., ECF No. 28-3; Saxon Decl., ECF No. 28-4; Bankston Decl., ECF No. 28-5; Fabish Decl., ECF No. 28-6.  The members live in various places along the

---

[2]  Academics and jurists have raised well-founded questions about associational standing.  *See, e.g.*, *All. for Hippocratic Med.*, 602 U.S. at 398–405 (Thomas, J., concurring); *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1167–70 (D.C. Cir. 2025) (Henderson, J., concurring); Michael T. Morley & F. Andrew Hessick, *Against Associational Standing*, 91 U. Chi. L. Rev. 1539, 1567–72 (2024).  The Court follows binding precedent in applying it here.

Louisiana and Texas coasts. *See* Robinson Decl. ¶ 4 (Lake Charles, Louisiana); Fournier Decl. ¶ 2 (New Orleans, Louisiana); Saxon Decl. ¶ 2 (Brownsville, Texas); Bankston Decl. ¶ 2 (Houston, Texas); Fabish Decl. ¶ 6 (same). They all are concerned about their local air quality. One member complains that the Houston/Galveston area "does not meet current [EPA] air quality standards for ozone pollution" and asserts "that a substantial portion of this ozone pollution results from activities connected to oil and gas operations on the [OCS]." Bankston Decl. ¶ 9. He reports that "poor air quality" has caused him respiratory problems, swollen sinuses, and coughing. *Id.* ¶¶ 15–16. These health issues have compromised his "ability to enjoy the environment and outdoors." *Id.* ¶ 17.

Other members share similar stories. *See, e.g.*, Fournier Decl. ¶ 15 ("I spend a large amount of my free time sailing on the Gulf, including on the [OCS], and in areas that are directly affected by pollution from offshore oil and gas activities."); Saxon Decl. ¶ 24 ("I want to continue enjoying being outdoors and doing the activities that I love with my family, but I am concerned about the health impacts that poor air quality in the Gulf will have on me and my family."). And they all blame the Bureau—alleging that the Final Rule's regulatory shortcomings worsen air pollution and its harms. *See, e.g.*, *id.* ¶ 32.

These declarations suffice. Healthy Gulf manages to satisfy binding precedent's demands for injury, causation, and redressability.

## A. Injury

Look first at injury. That prong requires Healthy Gulf to show that its members "use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw*, 528 U.S. at 183 (cleaned up). Under current doctrine, this element is generous toward would-be environmental plaintiffs. *See Am. Canoe*

8

*Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) ("In the environmental litigation context, the standing requirements are not onerous."); *cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized harm to . . . the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice.").

Here, multiple members allege that local air pollution harms their respiratory health and deters them from their recreational pursuits. *See supra* Part III. The D.C. Circuit has blessed this kind of showing. Consider *Association of Battery Recyclers v. EPA*, 716 F.3d 667 (D.C. Cir. 2013) (per curiam). The environmental groups in that case challenged the EPA's "revised emissions standards for secondary lead smelting facilities." *Id.* at 669. To support standing, the groups' members stated "that they live[d] or work[ed] in close proximity to smelters and ha[d] reduced their time outdoors in response to concerns about pollution." *Id.* at 672. In the Circuit's eyes, those were "precisely the kinds of harms the Supreme Court has deemed sufficient to show injury in fact." *Id.* (citing *Laidlaw*, 528 U.S. at 183); *see also, e.g.*, *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1016–17 (D.C. Cir. 2014) (holding that environmental organizations had standing where their members were "concerned about the emissions' effects on their health and, in some cases, spen[t] less time outdoors on that account"); *Sierra Club v. EPA*, 926 F.3d 844, 848–49 (D.C. Cir. 2019) (concluding the same where environmental group's members declared "that the haze present[ed] health concerns and reduce[d] their enjoyment of the [affected] parks").

### B. Causation

Causation is a closer call—but here, too, Healthy Gulf squeaks by.

Healthy Gulf blames the Bureau for permitting oil and gas operators to pollute the air. Its members contend that the Final Rule will allow pollution to continue unabated, thereby aggravating their health concerns and recreational losses. *See, e.g.*, Robinson Decl. ¶ 6. Healthy Gulf bolsters its case by pointing to the Bureau's own findings in the administrative record. *See* Healthy Gulf Mot. Summ. J., ECF No. 28-1, at 28. It cites a 2019 Bureau study on the air quality impact of ten proposed oil and gas leases. *See* A.R. at BOEM03990. Among other things, that study found that the proposed facilities would raise concentrations of certain criteria pollutants along the Gulf Coast. *See id.* at BOEM03990–91. More particularly, the study identified one site near Houston "where the contribution of the new platforms and associated support vessels and aircraft . . . was enough to push it from just below the 70 ppb NAAQS . . . to just above the NAAQS," thus nudging that site into nonattainment. *Id.* at BOEM04201.

The Bureau marshals evidence that challenges Healthy Gulf's causal story. *See* Bureau Mot. at 19; *see also, e.g.*, A.R. at BOEM14580 (2015 study of two lease sales finding that "[e]missions of pollutants into the atmosphere from the routine activities . . . are projected to have minimal impacts to onshore air quality because of the prevailing atmospheric conditions, emission heights, emission rates, and the distance of these emissions from the coastline"). Even Healthy Gulf's best evidence (the 2019 study) shows only a modest causal effect. *See id.* at BOEM03990–91.

For standing purposes, however, Healthy Gulf has done enough. The Final Rule need not be the sole cause of the members' injuries; Healthy Gulf must show only that the Bureau's actions "will cause [its members] to suffer an additional quantum of th[eir] harm." *Sierra Club v. FERC*, 827 F.3d 59, 67 (D.C. Cir. 2016); *see also, e.g.*, *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017) ("Article III standing does not require that the defendant be the most

10

immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be fairly traceable to the defendant." (cleaned up)).  Notably, the causal standard Healthy Gulf must meet to get through the courthouse doors is more favorable than the causal standard that OCSLA demands for Healthy Gulf to prevail on some of its claims.  The latter requires the Bureau to regulate air quality only "to the extent that activities authorized under this subchapter *significantly affect* the air quality of any State."  *See* 43 U.S.C. § 1334(a)(8) (emphasis added); *see also Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000) (directing courts to avoid "conflat[ing] standing with the merits").  More on that below.

The Bureau hangs its hat on the Fifth Circuit's decision in *Center for Biological Diversity v. EPA*, 937 F.3d 533 (5th Cir. 2019), but that case is distinguishable.  The plaintiffs there sued over an EPA "general permit for various oil and gas operations" that they claimed would "increase pollution in the Gulf."  *Id.* at 535–36.  The problem with their standing theory was that it was insufficiently granular, especially considering their challenge's Gulf-wide scope.  *See id.* at 539.  The plaintiffs stated that "the General Permit authorize[d] discharges from oil and gas facilities operating in federal waters in the Western and Central portions of the Gulf"—but "[we]re no more specific than that."  *Id.* (cleaned up).

In the Fifth Circuit's eyes, that was insufficient.  Given the Gulf's size and its varying "wind, weather, and tides," the plaintiffs had not "provide[d] nearly enough information to infer, with any degree of certainty, that any discharges w[ould] geographically overlap with their interests."  *Id.*; *see also Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 667 (D.C. Cir. 1996) ("In the case of broad rulemaking, a court may not assume that the areas used and enjoyed by a prospective plaintiff will suffer all or any environmental consequences that the rule itself may cause.").

11

Healthy Gulf's lawsuit falls on the other side of that line, if barely.  Unlike the plaintiffs before the Fifth Circuit, Healthy Gulf's members allege injuries in specific locales like the Houston area.  *See supra* Part III.  And they offer evidence suggesting that OCS emissions have at least some impact on those locales' air quality.  *See supra* Part III.B.  For standing, Healthy Gulf thus has provided all that binding precedent demands.  *See, e.g.*, *Nat. Res. Def. Council*, 755 F.3d at 1016–17 (finding causation met where plaintiffs said they spent time near facilities that would burn more fuels due to an EPA rule); *Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (approving standing where plaintiff's members were "stargazers and astronomers who 'use' the sky and whose aesthetic and recreational activities w[ould] be inhibited by light pollution from the satellites").

### C.  Redressability

Causation and redressability "are often flip sides of the same coin."  *See All. for Hippocratic Med.*, 602 U.S. at 380 (cleaned up).  That overlap exists because "correcting the conduct that causes an injury typically solves the problem."  *W. Coal Traffic League v. Surface Transp. Bd.*, 998 F.3d 945, 951 (D.C. Cir. 2021).  Things are thornier here:  The Bureau insists that "even if [Healthy Gulf's] members were injured by [the Bureau's] decision not to finalize certain proposals from its 2016 Proposed Rule, [it] cannot ask the Court to direct [the Bureau] to make a policy decision to promulgate more restrictive air quality regulations."  Bureau Mot. at 22.  Although that argument has surface-level appeal, it does not defeat Healthy Gulf's standing.

To be sure, the Court cannot dictate air quality regulations.  *See Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 64 (D.D.C. 2019) ("It is not the Court's role to decide which proposed regulations should, or should not, be adopted . . . .").  The Court would venture outside

its constitutional role if, for example, it told the Bureau to set EETs at a specific level.  "That issue—as is true of all relevant policy decisions—is delegated to the agency, not [the] [C]ourt." *See W. Coal. Traffic League*, 998 F.3d at 951; *id.* at 950–51 (concluding that plaintiff's claim was not redressable because courts "lack the power to issue an order to break the [Surface Transportation Board's] deadlock"); *Johnson v. Becerra*, 111 F.4th 1237, 1243 (D.C. Cir. 2024) ("The plaintiffs seek judicial reordering of the enforcement and policy priorities of the Secretary [of Health and Human Services], but granting such relief is generally not within the power of the Article III courts.").

But that is not quite what Healthy Gulf seeks.  In short, Healthy Gulf contends that the Bureau's Final Rule violated the APA and OCSLA in multiple respects.  *See* Compl. ¶ 1.  It wants this Court to recognize those deficiencies, vacate the Final Rule, and order the Bureau "to promulgate a new rule that fulfills the legal requirements of the APA and OSCLA."  *Id.* at 34. The D.C. Circuit has approved similar remedies as the basis for standing.  *See Ass'n of Battery Recyclers*, 716 F.3d at 673 ("Moreover, were we to require EPA to regulate the [hazardous air pollutants] to which their members are exposed more stringently than the agency has already purported to do, as petitioners ask, this alleged injury would likely be redressed." (cleaned up)); *cf. Sierra Club v. EPA*, 992 F.2d 337, 345 (D.C. Cir. 1993) ("Accordingly, we vacate the rule's small landfill exemption and remand to the [EPA] for further action consistent with the statutory requirement.").

Though the distinction is subtle, Healthy Gulf is not asking the Court to commandeer the Bureau's regulatory authority.  It instead wants the Bureau to exercise its discretion within what it sees as the APA's and OCSLA's bounds.  *See Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012) (ruling that courts "must assume for standing purposes" that plaintiffs are "correct on

the merits"); *see also Cutler v. HHS*, 797 F.3d 1173, 1179 (D.C. Cir. 2015) ("In evaluating standing at this juncture, we must assume that the party asserting federal jurisdiction is correct on the legal merits of his claim, that a decision on the merits would be favorable and that the requested relief would be granted." (cleaned up)).  Having assured itself that Healthy Gulf has standing under governing precedent, the Court will proceed to the merits.[3]

## IV.  APA MERITS

Healthy Gulf brings a bevy of APA claims.  *First*, it argues that the Final Rule runs afoul of the Bureau's regulatory mandate under OCSLA.  Healthy Gulf Mot. at 32–36.  *Second*, Healthy Gulf contends that the Final Rule improperly relied on executive orders promoting domestic energy production.  *Id.* at 36–39.  *Third*, it asserts six ways in which the Bureau "failed to provide a reasoned explanation for the Final Rule."  *Id.* at 39–44.  *Fourth*, Healthy Gulf adds three more ways in which the Bureau "failed to consider important aspects of the problem of offshore oil and gas pollution."  *Id.* at 44–48.  None of that spaghetti sticks.

Before digging into the claims, another word on the standard of review.  Recall that the APA tells courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  When an APA claim presents an issue of statutory interpretation, the Court reviews it de novo.  *See Loper Bright Enterp. v. Raimondo*, 603 U.S. 369, 412–13 (2024).  By contrast, when assessing claims that an agency decision was "arbitrary and capricious," courts have long looked to *Motor Vehicle*

---

[3]  The Bureau also ventures that "[t]he Court lacks jurisdiction to the extent [Healthy Gulf] ha[s] brought OCSLA claims because they have failed to comply with the 60-day notice requirement in 43 U.S.C. § 1349(a)(2)(A)."  Bureau Mot. at 23.  That argument is a nonstarter.  Healthy Gulf asserts that the Final Rule conflicts with OCSLA, but that claim travels under an APA cause of action.  *See* Compl. ¶¶ 75–81; 5 U.S.C § 706(2)(A) (directing courts to "hold unlawful and set aside agency action" that is "not in accordance with law").  There is no pure OCSLA claim.

*Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983). In that landmark decision, the Supreme Court ruled that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43 (cleaned up). *State Farm* also listed some common ways in which the agency could fall short: "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Nonetheless, the Court emphasized that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.*

The parties each try to supplant *State Farm*. Healthy Gulf invites the Court to apply the more searching review for specific agency policy changes articulated in *FCC v. Fox Television Stations*, 556 U.S. 502 (2009). *See* Healthy Gulf Mot. at 30–31. The Bureau, meanwhile, wants the Court to deploy the so-called "logical outgrowth" test. *See* Bureau Mot. at 37. The Court rejects both bids.[4]

This lawsuit is a poor match for *Fox*. That case did not set a uniformly higher bar for agency policy changes, much less one that would govern here. The *Fox* Court "f[ound] no basis"—whether in the APA or its own precedent—"for a requirement that all agency change be subjected to more searching review." 556 U.S. at 514. In the mine run of cases, the agency

---

[4] API is the only party to hit the mark on the standard of review. *See* API Mot. at 17 (arguing for the *State Farm* test).

"need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* at 515. Only "[s]ometimes" is "a more detailed justification" necessary: "when, for example, [the agency's] new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests." *Id.*

Healthy Gulf's arbitrary and capricious claims are all premised on one "change"—from the Proposed Rule to the Final Rule. The flaw in its argument is that a proposed rule is not a policy, let alone one that would invite greater scrutiny when altered. Quite the opposite. "Agencies[] are free—indeed, they are encouraged—to modify proposed rules as a result of the comments they receive." *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951 (D.C. Cir. 2004). Placing an explanatory surcharge on an agency's revisions to a proposed rule would defy the very point of notice-and-comment rulemaking: "(1) to allow the agency to benefit from the expertise and input of the parties who file comments with regard to the proposed rule, and (2) to see to it that the agency maintains a flexible and open-minded attitude towards its own rules." *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1325 (D.C. Cir. 1988) (cleaned up). Unsurprisingly, none of Healthy Gulf's cases supports its incongruous position. *See Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (Kavanaugh, J.) (citing *Fox* merely for the idea that "[t]he IRS is surely free to change (or refine) its interpretation of a statute it administers"); *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) (not even citing *Fox*).

Nor is this dispute suited for the logical outgrowth test. "A final rule qualifies as a logical outgrowth [of the proposed rule] if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Idaho Conservation League v. Wheeler*, 930 F.3d 494, 508

16

(D.C. Cir. 2019). To be sure, that test applies to some claims targeting differences between proposed and final rules—specifically, those alleging that the agency did not "compl[y] with the APA's notice requirements" under 5 U.S.C. § 553. *See Earthworks v. DOI*, 496 F. Supp. 3d 472, 499 (D.D.C. 2020), *aff'd*, 105 F.4th 449 (D.C. Cir. 2024); *see also City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003) ("The traditional APA 'logical outgrowth' test applies where an agency changes its final regulation in some way from the proposed regulation for which it provided notice and requested comment, as required under the APA."); 5 U.S.C. § 553(b)(3) (setting forth notice requirements for rulemaking). But crucially, it does not displace the *State Farm* test for the § 706 arbitrary and capricious claims that Healthy Gulf advances here. *See* Compl. at 30–34. Indeed, one of the Bureau's main cases gives away as much. In *Idaho Conservation League*, the Circuit first applied *State Farm* to the plaintiffs' arbitrary and capricious claims before it separately applied the logical outgrowth test to their § 553 notice claim. *See* 930 F.3d at 505, 508.

With the underbrush cleared, the Court's path emerges into view: It will review the Bureau's alleged misreading of OCSLA de novo, *see Loper Bright*, 603 U.S. 412–13, then use the trusty *State Farm* test to assess Healthy Gulf's arbitrary and capricious claims, *see* 463 U.S. at 43.[5]

### A. The Final Rule's Reading of OCSLA

A statutory recap is in order. Under OCSLA, the Secretary of the Interior (and, by delegation, the Bureau) "may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the [OCS]." 43 U.S.C. § 1334(a). The statute says that

---

[5] But, to be clear, Healthy Gulf would still lose here even under its preferred review standard.

"[t]he regulations prescribed by the [Bureau] under this subsection shall include, but not be limited to" eight types, ranging from the "cancellation of any lease or permit" to "the subsurface storage of oil and gas" and "the prompt and efficient exploration and development of a lease area." *Id.* § 1334(a)(1)–(8).  Most relevant is number eight—which empowers the Bureau to issue regulations "for compliance with the national ambient air quality standards pursuant to the Clean Air Act (42 U.S.C. 7401 et seq.), to the extent that activities authorized under this subchapter significantly affect the air quality of any State."  *Id.* § 1334(a)(8).

The parties disagree over OCSLA's mandate and whether the Final Rule meets it.  In the Final Rule, the Bureau maintained that "OCSLA's provisions on air quality provide the Secretary a much narrower authority to regulate when compared with the breadth of those authorities granted to the [EPA] in the Clean Air Act."  A.R. at BOEM00263; *see also id.* at BOEM00271.  Healthy Gulf considers this reading too cramped.  In its eyes, OCSLA grants "broad authority to regulate OCS pollution sources, including for the prevention of waste and conservation of natural resources."  Healthy Gulf Mot. at 32–33.  Healthy Gulf also asserts that the Bureau's exercise of that authority "must be guided by the Clean Air Act and [by] consult[ation] with EPA."  *Id.* at 33.

The Court agrees with the Bureau's interpretation.  OCSLA does not contain the sweeping—and unbounded—authority that Healthy Gulf locates there.  Instead, the statute gives the Secretary a specific directive: to promulgate regulations "for compliance with the national ambient air quality standards . . . to the extent that activities authorized under this subchapter significantly affect the air quality of any State."  43 U.S.C. § 1334(a)(8).  The provision confers both a power and an obligation—and gives each an outer limit: "to the extent that" OCS emissions "significantly affect the air quality of any State."  *See id.*

18

None of OCSLA's other provisions expands the Bureau's mandate as much as Healthy Gulf would want.  Healthy Gulf highlights the "shall include, but not be limited to" language. Healthy Gulf Mot. at 32; *see* 43 U.S.C. § 1334(a).  That proviso gives the Bureau some residual authority to regulate for "the prevention of waste and conservation of the [OCS's] natural resources."  *See id.*; *see also United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005) (recognizing that "[t]he words 'including, but not limited to' introduce a non-exhaustive list that sets out specific examples of a general principle," but deciding to "expand on the remedies explicitly included in the statute only with remedies similar in nature to those enumerated").

Healthy Gulf cannot rest on so thin a reed.  The proviso does not bestow an unlimited mandate "to regulate OCS pollution sources" without regard to their effect on onshore air quality.  *See* Healthy Gulf Mot. at 32–33.  Concluding otherwise would infringe the "commonplace" canon that the "specific governs the general"—which prevents a vague "general authorization" from swallowing "a more limited, specific" one.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (cleaned up); *see also* Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012) ("If there is a conflict between a general provision and a specific provision, the specific provision prevails . . . .").  Healthy Gulf's asserted unenumerated regulatory power would also defy the maxim that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions" or "hide elephants in mouseholes."  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

The Bureau's reading also has pedigree.  It matches how the Bureau's predecessor agency understood its authority shortly after the relevant provisions' enactment.  In its 1980 final

19

rule on "Oil and Gas and Sulphur Operations in the [OCS]," the U.S. Geological Survey recognized that Interior's "mandate under [OCSLA] is different than EPA's mandate under the Clean Air Act": Whereas "[t]he Clean Air Act gives EPA the authority to regulate air pollution sources onshore," OCSLA, "on the other hand, authorizes [Interior] to regulate OCS activities only if the emissions from the activities have significant effects on onshore air quality." A.R. at BOEM00001. That interpretation further reinforces what the text already compels. *See Loper Bright*, 603 U.S. at 370 (ruling that "due respect" is "especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time").

The parties also submit their favorite snippets of legislative history. According to Healthy Gulf, the "legislative history provides that the Department of Interior 'shall be guided by the Clean Air Act, in consultation with [EPA], in promulgating regulations to maintain consistency with ambient air quality standards.'" Healthy Gulf Mot. at 32 (quoting H.R. Conf. Rep. No. 95-1474, at 86 (1978)). The Bureau sees it differently: It contends that "Congress intended 43 U.S.C. § 1334(a)(8) to prompt regulation 'when a determination is made that offshore operations may have or are having a significant effect on the air quality of an adjacent onshore area.'" Bureau Mot. at 26 (quoting H.R. Conf. Rep. No. 95-1474, at 85 (1978)).

The parties' dueling submissions are prime examples of "entering a crowded cocktail party and looking over the heads of the guests for one's friends." *See* Scalia & Garner, *supra*, at 377 (footnote omitted). The Court declines to consider these extratextual materials. *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 350 (D.C. Cir. 2019) ("[W]hen the statutory text is clear, legislative history should not be used to muddy its meaning."); *Dig. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 172 (2018) (Thomas, J., concurring in the judgment) ("[W]e are a

20

government of laws, not of men, and are governed by what Congress enacted rather than by what it intended." (cleaned up)).

Given the Bureau's proper statutory mandate, there also is no merit to Healthy Gulf's claim that the Final Rule violates OCSLA by "fail[ing] to ensure that OCS oil and gas operations do not cause or contribute to violations of the NAAQS." *See* Healthy Gulf Mot. at 32. Once again, this argument overstates OCSLA's directive—which is to regulate NAAQS compliance only "to the extent that activities authorized under this subchapter significantly affect the air quality of any State." 43 U.S.C. § 1334(a)(8). Nor has Healthy Gulf shown that the current regulations permit widespread NAAQS violations. It relies mainly on the 2019 study, which found one site near Houston "where the contribution of the new platforms and associated support vessels and aircraft . . . was enough to push it from just below the 70 ppb NAAQS . . . to just above the NAAQS" into nonattainment territory. A.R. at BOEM04201. But that data point does not suffice to establish a "significant[] [e]ffect" on onshore air quality, *see* 43 U.S.C. § 1334(a)(8), especially given the Bureau's competing evidence. *See, e.g.*, A.R. at BOEM14580 ("Emissions of pollutants into the atmosphere from the routine activities . . . are projected to have minimal impacts to onshore air quality . . . ."); *id.* at BOEM03856 (finding that the EETs were "overly conservative for most annual standards").

In sum, the Court holds that the Final Rule did not flout OCSLA's regulatory mandate.

### B. The Final Rule's Cost-Benefit Analysis

Healthy Gulf next faults the Bureau "for rejecting the Proposed Rule's much-needed updates" based on a trio of executive orders. Healthy Gulf Mot. at 36; *see Reducing Regulation and Controlling Regulatory Costs*, Exec. Order No. 13771, 82 Fed. Reg. 9339 (Jan. 30, 2017); *Promoting Energy Independence and Economic Growth*, Exec. Order No. 13783, 82 Fed. Reg.

16093 (Mar. 28, 2017); *Implementing an America-First Offshore Energy Strategy*, Exec. Order No. 13795, 82 Fed. Reg. 20815 (Apr. 28, 2017). As Healthy Gulf sees things, the agency arbitrarily and capriciously relied on these deregulatory directives.

Healthy Gulf's claim has two weaknesses—each independently fatal. *First*, the Bureau's cost-benefit analysis did not run counter to OCSLA. In the Final Rule's preamble, the Bureau emphasized that the relevant executive orders "only directed the review of agency actions and did not direct specific outcomes for rulemakings." A.R. at BOEM00263. That echoes the orders themselves. *See, e.g.*, Exec. Order No. 13795, 82 Fed. Reg. at 20817 ("The Secretary of the Interior shall take all steps necessary to review [the Bureau's] Proposed Rule . . . and, if appropriate, shall, as soon as practicable and *consistent with law*, consider whether the proposed rule, and any related rules and guidance, should be revised or withdrawn." (emphasis added)).

More, cost-benefit analysis is baked into OCSLA's regulatory scheme. The statute does not demand regulation at any cost. Instead, it directs Interior to issue only those regulations that are "necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the [OCS]." 43 U.S.C. § 1334(a). OCSLA describes the OCS as "a vital national resource reserve" and envisions for it to "be made available for expeditious and orderly development, subject to environmental safeguards." *Id.* § 1332(3). In considering regulatory burdens, the Bureau thus was following OCSLA's instructions. *See Ctr. for Sci. in the Pub. Int. v. Dep't of Treasury*, 797 F.2d 995, 1002 n.7 (D.C. Cir. 1986) ("Agencies can consider the economic impact of their regulations, pursuant to executive orders . . . when the underlying statute permits such consideration."); *Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions.").

22

*Second*, Healthy Gulf has not shown that the Bureau's cost-benefit analysis was arbitrary or capricious in its substance. Courts are especially careful "not to substitute [their] judgment for that of the agency . . . when the agency is called upon to weigh the costs and benefits of alternative policies." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (Roberts, J.) (cleaned up); *see also Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985) (Scalia, J.) ("[C]ost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency . . . ." (cleaned up)). "[I]n view of the complex nature of economic analysis typical in the regulation promulgation process, [Healthy Gulf's] burden to show error is high." *See Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 563 (D.C. Cir. 2002) (per curiam).

Healthy Gulf does not carry that burden. The Bureau stepped back from the Proposed Rule's more drastic revisions in part because they would "[u]nduly burden the industry." A.R. at BOEM00266. Before issuing the Final Rule, the agency reviewed almost two dozen comments that "addressed the benefits of the rule (in terms of emissions reductions) compared to the burdens (*i.e.*, costs), necessity, practical utility, [and] burden reduction." *Id.* at BOEM00270. Several of those comments challenged "the calculations and estimates provided by [the Bureau] with the proposed rule." *Id.*; *see also, e.g.*, *id.* at BOEM00693 ("Our consultant surveyed OCS operators and vendors for historical cost information, and considering just some of the additional costs of the proposed rule, we estimate a total 10 year cost of more than $3.4 billion, more than 10 times [the Bureau's] estimate.").

Based on these comments, the Bureau "concur[red] that the compliance costs in the proposed rule's regulatory impact analysis were underestimated and the benefits were overestimated." *Id.* at BOEM00283. That judgment was well within the agency's discretion.

23

*See Ne. Md. Waste Disposal Auth.*, 358 F.3d at 951 ("Agencies[] are free—indeed, they are encouraged—to modify proposed rules as a result of the comments they receive."). Though Healthy Gulf "would surely have assessed the various costs and benefits in a different manner, the Court does not have the power to take up the agency's analysis *de novo*." *See Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 407 (D.D.C. 2017), *aff'd*, 944 F.3d 267 (D.C. Cir. 2019).

### C. The "Reasoned Explanation" Claims

Healthy Gulf next serves up six ways in which the Bureau "failed to provide a reasoned explanation for the Final Rule." Healthy Gulf Mot. at 39–44. None of its complaints has merit.

### i.

Three of Healthy Gulf's claims have a similar flavor: All take issue with the Bureau's decision not to update certain metrics. Healthy Gulf reprimands the agency for (1) failing to devise new EETs;[6] (2) keeping TSP in its EET formulas instead of "establish[ing] thresholds for $PM_{10}$ and $PM_{2.5}$"; and (3) for "retain[ing] only annual [EETs], rather than setting hourly thresholds for pollutants like $NO_2$ and $SO_2$ to comply with the NAAQS." *See id.* at 40, 41, 43. The Court considers this overlapping trio together.

Like the cost-benefit calculus, this is terrain on which courts tread lightly. For decades, the D.C. Circuit has given "particular deference . . . to an agency with regard to scientific matters in its area of technical expertise." *Nat'l Wildlife Fed'n*, 286 F.3d at 560; *accord, e.g., Ctr. for Biological Diversity v. EPA*, 749 F.3d 1079, 1087–88 (D.C. Cir. 2014) (collecting cases); *Loper*

---

[6] To the extent that Healthy Gulf faults the Bureau for not updating the significance levels, Healthy Gulf Mot. at 40, that claim is misplaced. *See* A.R. at BOEM00277 ("This final rule updates the table of [significance levels] in the existing regulations with the [EPA's] current values.").

*Bright*, 603 U.S. at 392 ("Section 706 *does* mandate that judicial review of agency policymaking and factfinding be deferential.").

Against this backdrop, take the Bureau's explanations—each of which strike a similar tone. To justify its decision not to refresh the EETs, the agency maintained that it did not "ha[ve] an adequate scientific basis for establishing new formulas." A.R. at BOEM00273. In the interval between the Proposed Rule and Final Rule, the Bureau had completed "two air quality modeling studies to evaluate the impact of OCS operations" in the Gulf and Alaska, respectively. *Id.* at BOEM00265. Neither study settled on concrete revisions to the EETs. *See id.* If anything, both studies determined that the EETs were "overly conservative for most annual standards"—*i.e.*, they required facilities to perform follow-up modeling "more often than is necessary." *Id.* at BOEM03856, BOEM04560. The Bureau submitted the Gulf study for peer review by the National Academies of Science, Engineering, and Medicine ("NASEM"). *Id.* at BOEM00265. When it published the Final Rule, the Bureau was still evaluating NASEM's recommendations—and proposed a follow-up study on updating the EETs. *Id.* The Final Rule thus signaled the Bureau's openness to revamping the EETs should further evaluation recommend it.

The Bureau's ongoing analysis was also the main reason for retaining TSP in the EET formulas rather than swapping it for $PM_{10}$ and $PM_{2.5}$. *See id.* at BOEM00264. Meanwhile, the agency did make one of Healthy Gulf's preferred changes on this front: "replac[ing] the TSP significance level values with those of $PM_{10}$ and $PM_{2.5}$." *Id.* The Final Rule thus "require[s] operators, whose emissions exceed the EET for TSP, to use modeling to determine whether their facility would cause an exceedance of the [significance levels] for $PM_{10}$ and $PM_{2.5}$." *Id.* (footnote omitted).

25

Finally, the Bureau decided to stand by its annual EETs rather than devising hourly ones. Once again, that judgment was the product of unresolved scientific uncertainty:  The Final Rule "defer[ed] any consideration about . . . add[ing] new EETs corresponding to non-annual emissions averaging times for the criteria air pollutants pending the evaluation of results of [the] air quality studies." *Id.* at BOEM00272.

The Bureau's wait-and-see approach was neither arbitrary nor capricious.  The agency reasonably decided not to revamp the various metrics before further scientific study showed both a need and a path forward.  Healthy Gulf offers no evidence dictating otherwise.  To be sure, the NASEM review stated that the EETs "clearly need to be updated to reflect newly regulated pollutants (i.e., $PM_{2.5}$ and $PM_{10}$) and updated (i.e., 8-hour average ozone, 1-hour-average $NO_2$ and $SO_2$) air quality standards as well as state-of-the-science dispersion and photochemical models." *Id.* at BOEM04658.  But NASEM did not offer any concrete proposal for how to update the metrics.  Reviewing the "several new versions of EETs," NASEM found that none were "protective of all NAAQS because of the continued existence of false negatives for several pollutants." *See id.* at BOEM04660–61.  Without identifying a workable alternative that the Bureau disregarded, Healthy Gulf cannot establish that the agency violated the APA.

Indeed, the D.C. Circuit rebuffed this type of argument in *Center for Biological Diversity*.  There, several environmental organizations sued the EPA after it decided "that it needed further studies before it could set a new, joint, 'secondary' national ambient air quality standard" for acid rain components.  *Ctr. for Biological Diversity*, 749 F.3d at 1080.  Both sides agreed that the existing secondary standard was "not adequate to protect against adverse effects on water bodies from acid rain." *Id.* at 1087.  In the environmental groups' view, this meant "that the Clean Air Act required EPA to issue a new secondary standard that would provide

sufficient protection." *Id.* They "dispute[d] EPA's conclusion that it lacked sufficient scientific information to make a reasoned judgment" and contended, in any event, that the agency "failed to provide an adequate explanation on that score." *Id.*

To the D.C. Circuit, "[d]ecades of decisions in this court st[ood] in the way of these arguments." *Id.* Canvassing opinions from the past half century, the court highlighted a common refrain of "deference to an agency's evaluations of scientific data within its area of expertise." *Id.* at 1088 (cleaned up). Against that background, the court upheld the EPA's decision not to set a new standard "without further studies." *Id.* at 1089. So too here.

**ii.**

The Final Rule also declined the Proposed Rule's overhaul because it would have "potentially prevent[ed] [the Bureau] from complying with the statutorily mandated timeframes for completing exploration and development plan reviews." A.R. at BOEM00266. Healthy Gulf deems this explanation unfounded. Healthy Gulf Mot. at 41. As its sole countervailing evidence, it cites the Proposed Rule's regulatory impact analysis, which stated that "[t]he proposed requirements [we]re intended to improve [the Bureau's] review and approval of planned operations by requiring more accurate information and better assessments of the air quality impacts from OCS oil and gas operations." A.R. at BOEM00077–78; *see* Healthy Gulf Mot. at 41.

This claim falls flat. The Bureau highlighted the OCSLA provisions that "mandate[] particular timeframes" for reviewing exploration and development plans. A.R. at BOEM00269; *see* 43 U.S.C. § 1340(c)(1) (requiring the Secretary to approve or disapprove an exploration plan within 30 days); *id*. § 1351(h)(1) (setting timeframe for approving or disapproving development plans). These deadlines serve OCSLA's purpose to promote "expeditious and orderly

27

development, subject to environmental safeguards." *Id.* § 1332(3).  In the Final Rule, the Bureau maintained that many of the Proposed Rule's "provisions would have added substantial burdens to both [Bureau] staff in reviewing plans and to operators' ability to fully conform to the proposed rule's provisions"—and thus "would have made meeting the[] [statutory] deadlines difficult."  A.R. at BOEM00269.

That assessment echoed multiple commenters' concerns "that the proposed rule would have impaired [the Bureau's] ability to timely process applications for plan approvals."  *Id.*; *see also, e.g.*, *id.* at BOEM00728 (comment arguing that "[e]ven if an operator or lessee were to submit a plan in full compliance with the proposed rule, it would be impossible for [the Bureau] to review the voluminous amount of information (including data, emissions information, modeling, etc.) required under the proposed rule within the required timeframes").  It was not arbitrary or capricious for the Bureau "to modify [the] proposed rule[] as a result of the comments [it] receive[d]."  *See Ne. Md. Waste Disposal Auth.*, 358 F.3d at 951.

### iii.

The next bone of contention is over emissions from so-called mobile support craft ("MSC")—a term for vessels and aircraft that support OCS production.  The Proposed Rule pitched a requirement that operators in both the Gulf and Alaska "report and attribute the MSC['s] [emissions] to facilities to which the vessel is actually providing operational support, regardless of its distance from that facility."  A.R. at BOEM00152.  The Final Rule rejected that change, explaining that "the proposed provisions were legally questionable and raised numerous practical problems."  *Id.* at BOEM00269.

On the legal side, the Bureau asserted that it was "questionable whether [it] has legal authority to include vessel emissions as proposed."  *Id.* at BOEM00273.  After all, "[t]he

Secretary's statutory authority is distinct from that of the [EPA] under the [Clean Air Act]." *Id.* The Clean Air Act expressly grants the EPA jurisdiction over "emissions from any vessel servicing or associated with an OCS source." 42 U.S.C. § 7627(a)(4)(C)(iii). OCSLA has no such language; instead, it allows the Secretary to regulate "for compliance with the [NAAQS] . . . to the extent that *activities authorized under this subchapter* significantly affect the air quality of any State." 43 U.S.C. § 1334(a)(8) (emphasis added). OCSLA further delimits the reach of the federal government's jurisdiction over the OCS—which, as relevant here, extends only to "installations and other devices permanently or temporarily attached to the seabed . . . for the purpose of exploring for, developing, or producing resources" and "any such installation or other device (*other than a ship or vessel*) for the purpose of transporting or transmitting such resources." *Id.* § 1333(a)(1)(A) (emphasis added). Based on that statutory language, the Final Rule concluded that adding MSC emissions to a facility's reporting obligations was "potentially beyond the scope of the [Bureau's] statutory authority." A.R. at BOEM00273 (footnote omitted).

On the practical front, the agency's justification was curt. It noted simply that multiple commenters had raised feasibility concerns about "requiring operators to prepare plans with the highly specific details about vessel emissions sources that the proposed rule would have required." *Id.*; *see also, e.g.*, *id.* at BOEM00690 (commenter arguing that, "[a]t the time of plan submittal, neither the contractor nor the designated operator will know with any certainty what vessel will be used let alone any of the detailed information the rule requires").

29

Taken together, these reasons pass muster.  Given OCSLA's language, the Bureau was right to doubt that its jurisdiction reaches MSC emissions beyond 25 miles.[7]  Paired with the practical concerns, those doubts provided more than a "satisfactory explanation" for the agency's decision.  *See State Farm*, 463 U.S. at 43.  Healthy Gulf, meanwhile, does not challenge the Bureau's interpretation, let alone put forward an alternative reading.  It instead gestures toward various "factual findings," including in the Proposed Rule, suggesting that "MSC emissions make up a substantial portion of total OCS emissions."  Healthy Gulf Mot. at 42; *see also* A.R. at BOEM00151.  Even if accurate, Healthy Gulf's evidence does not displace the Bureau's jurisdictional argument.  Nor does it suffice, even on its own merits, to show that MSC emissions "significantly affect the air quality of any State."  *See* 43 U.S.C. § 1334(a)(8).  In short, Healthy Gulf's claim does not fly.

**iv.**

Healthy Gulf's sixth complaint is that the Bureau decided only to "evaluate air quality impacts to a state's shoreline rather than the seaward boundary."  Healthy Gulf Mot. at 43.  Healthy Gulf would have preferred the agency adopt the Proposed Rule's position, which reinterpreted OCSLA's mandate to "include the entire area of a State's jurisdiction extending to its seaward boundary."  A.R. at BOEM00154.  This interpretation would have "changed the distance term in the emission exemption formulas, and required that non-exempt plans provide modeling results, which would include air quality effects over offshore State submerged lands in addition to onshore effects."  *Id.* at BOEM00277.

---

[7]  True, the Bureau's current regulations require operators to report MSC emissions within 25 miles of the facility.  *See* Healthy Gulf Mot. at 48; A.R. at BOEM00273.  But this does not salvage Healthy Gulf's bid to expand the reporting requirement beyond that.  The legality of this current reporting requirement is not challenged here and is thus not before the Court.

The Final Rule returned to "the current and long-standing approach . . . of evaluating impacts to the air quality of a State at its shoreline." *Id.* The Bureau acknowledged that "the term 'State,' read in isolation from its context in the statutory phrase 'significantly affect the air quality of any State' could be interpreted to include offshore submerged lands of the State." *Id.* at BOEM00278. But "context and purpose" counseled otherwise. *Id.* Aside from citing legislative history, the agency underlined OCSLA's textually manifest goal of "ensur[ing] compliance with the NAAQS," which "have historically been established based on an evaluation of impacts to onshore populations and resources." *Id.*

On top of the statutory argument, the Bureau also pointed to "two practical considerations" favoring retreat from the Proposed Rule. *Id.* For one, the agency maintained that it was still "completing its study of the EET formulas, so any changes to the distance term in the formulas would [have] be[en] premature." *Id.* For another, "the lack of monitoring stations offshore . . . would make determinations about the offshore impacts of a facility's emissions uncertain." *Id.*

It was not arbitrary or capricious for the Bureau to stand by its long-term position. In context, the Final Rule's reading of its statutory mandate is the better one—especially considering the NAAQS's onshore focus. That conclusion is reinforced by the longstanding nature of the Bureau's interpretation. *See Loper Bright*, 603 U.S. at 370. Healthy Gulf counters mainly "that air quality above states' submerged lands has health effects on 'the onshore population' because state residents spend significant time in nearshore waters." Healthy Gulf Mot. at 43. But Healthy Gulf has not shown that these effects are "significant" enough to trigger the Bureau's statutory mandate. *See* 43 U.S.C. § 1334(a)(8). Nor does its argument undercut the practical concerns that further bolstered the Bureau's position.

31

\* \* \*

Healthy Gulf brings six claims about the Bureau's failure to provide a reasoned explanation. None survives.

### D. The "Failure to Consider" Claims

The final course on Healthy Gulf's menu: three claims that "[t]he Bureau failed to consider important aspects of the problem of offshore oil and gas pollution." Healthy Gulf Mot. at 44–48. All three are reheated fare, so the Court can dispose of them quickly.

*First*, Healthy Gulf contends that "the Bureau failed to consider the impacts of air pollution from OCS oil and gas operations on nonattainment areas and environmental justice communities." Healthy Gulf Mot. at 44. For the most part, this repackages the claim that the Final Rule infringes OCSLA "because it fails to even ensure that OCS oil and gas operations do not cause or contribute to violations of the NAAQS." *See id.* at 35.

The Court rejects this argument for the reasons discussed above. In short, Healthy Gulf has not established that the Final Rule falls short of the Bureau's mandate to regulate "for compliance with the [NAAQS] . . . to the extent that activities authorized under this subchapter significantly affect the air quality of any State." *See* 43 U.S.C. § 1334(a)(8). Much of the administrative record points the other way. *See, e.g.*, A.R. at BOEM14580 ("Emissions of pollutants into the atmosphere from the routine activities . . . are projected to have minimal impacts to onshore air quality . . . ."); *id.* at BOEM03856 (finding that the EETs were "overly conservative for most annual standards" and required follow-up modeling "more often than is necessary"). Nor does Healthy Gulf identify any statutory obligation to regulate more stringently for the benefit of "environmental justice communities," a term Healthy Gulf fails to define.

32

*Second*, Healthy Gulf asserts that "the Bureau failed to consider the impacts of OCS air pollution on individuals engaged in recreational activities on nearshore waters." Healthy Gulf Mot. at 45. This is another attempt to ding the agency for sticking to "the current and long-standing approach . . . of evaluating impacts to the air quality of a State at its shoreline." A.R. at BOEM00277; *see* Healthy Gulf Mot. at 43. That effort remains unsuccessful for the same reasons as above: In brief, the Bureau adequately explained why its onshore focus was the best reading of OCSLA and why practical concerns further counseled against the Proposed Rule's departure. *See supra* Part IV.C.

*Third*, Healthy Gulf complains about the Bureau's failure "to better account for and regulate emissions from vessels and other MSCs." Healthy Gulf Mot. at 47. Once again, the Court has déjà vu. *See id.* at 42 ("Fourth, the Final Rule rejected consideration of emissions from transiting support vessels and other mobile support crafts ('MSC') occurring beyond 25 miles of an OCS facility."). Once again, the Court rules against Healthy Gulf.

## V.  CONCLUSION

Healthy Gulf has many quarrels with the Final Rule. None amounts to a viable APA claim. The Court will thus grant summary judgment for the Bureau and the API. A separate Order will issue.

Dated: March 23, 2026                                TREVOR N. McFADDEN, U.S.D.J.

33